[611 NYS2d 859]

WOODY ALLEN, Appellant, v MARIA V. FARROW, Also Known as MIA FARROW, Respondent.

First Department, May 12, 1994

## APPEARANCES OF COUNSEL

*Elkan Abramowitz* of counsel *(Morvillo, Abramowitz, Grand, Iason & Silberberg [Jamie L. Kogan]; Phillips, Nizer, Benajmin, Krim & Ballon [Sheila Ginsberg Riesel, Julia Perles* and *Shelly Moroff];* and *J. Martin Obten* with her on the brief; attorneys), for appellant.

*Eleanor B. Alter* of counsel *(Martin Juvelier, Marguerite Sullivan* and *Maxine Shapiro* with her on the brief; *Rosenman & Colin,* attorneys), for respondent.

## OPINION OF THE COURT

Ross, J.

In this special proceeding commenced by petitioner to obtain custody of, or increased visitation with, the infant children Moses Amadeus Farrow, Dylan O'Sullivan Farrow and Satchel Farrow, we are called upon to review the IAS Court's decision which, *inter alia,* awarded custody of the three children to the respondent, denied the petitioner's requests regarding visitation and awarded counsel fees to the respondent. Upon such review we conclude, for the reasons set forth below, that the determination of the IAS Court was in accordance with the best interests of these children, and accordingly, we affirm.

The petitioner and the respondent have brought themselves to this unhappy juncture primarily as a result of two recent events. These are, Mr. Allen's affair with Soon-Yi Previn and the alleged sexual abuse of Dylan O'Sullivan Farrow by Mr. Allen. While the parties had difficulties which grew during Ms. Farrow's pregnancy with Satchel, it was the discovery of the relationship between Mr. Allen and Ms. Previn that intensified Ms. Farrow's concerns about Mr. Allen's behavior toward Dylan, and resulted in the retention of counsel by both parties. While various aspects of this matter remain unclear,

it is evident that each party assigns the blame for the current state of affairs to the other.

The parties' respective arguments are very clear. The petitioner maintains that he was forced to commence this proceeding in order to preserve his parental rights to the three infant children, because the respondent commenced and continues to engage in a campaign to alienate him from his children and to ultimately defeat his legal rights to them. The petitioner contends, *inter alia,* that the respondent seeks to accomplish her goals primarily through manipulation of the children's perceptions of him. He wishes to obtain custody, ostensibly to counteract the detrimental psychological effects the respondent's actions have had on his children, and to provide them with a more stable atmosphere in which to develop. Mr. Allen specifically denies the allegations that he sexually abused Dylan and characterizes them as part of Ms. Farrow's extreme overreaction to his admitted relationship with Ms. Previn.

The respondent maintains that the petitioner has shown no genuine parental interest in, nor any regard for, the children's welfare and that any interest he has shown has been inappropriate and even harmful. Respondent cites the fact that the petitioner has commenced and maintained an intimate sexual relationship with her daughter Soon-Yi Previn, which he has refused to curtail, despite the obvious ill effects it has had on all of the children and the especially profound effect it has had on Moses. It is also contended that petitioner has at best, an inappropriately intense interest in, and at worst, an abusive relationship with, the parties' daughter Dylan. Further, the respondent maintains that petitioner's contact with the parties' biological son, Satchel, is harmful to the child in that petitioner represents an emotional threat and has on at least one occasion threatened physical harm. Respondent contends that the petitioner's only motive in commencing this proceeding was to retaliate against the allegations of child sexual abuse made against him by Ms. Farrow.

Certain salient facts concerning both Mr. Allen's and Ms. Farrow's relationships to their children and to each other are not disputed. Review of these facts in an objective manner and the conclusions that flow from them, demonstrate that the determination of the IAS Court as to both custody and visitation is amply supported by the record before this Court.

From the inception of Mr. Allen's relationship with Ms. Farrow in 1980, until a few months after the adoption of

Dylan O'Sullivan Farrow on June 11, 1985, Mr. Allen wanted nothing to do with Ms. Farrow's children. Although Mr. Allen and Ms. Farrow attempted for approximately six months to have a child of their own, Mr. Allen did so apparently only after Ms. Farrow promised to assume full responsibility for the child. Following the adoption however, Mr. Allen became interested in developing a relationship with the newly adopted Dylan. While previously he rarely spent time in the respondent's apartment, after the adoption of Dylan he went to the respondent's Manhattan apartment more often, visited Ms. Farrow's Connecticut home and even accompanied the Farrow family on vacations to Europe. Allen also developed a relationship with Moses Farrow, who had been adopted by the respondent in 1980 and was seven years old at the time of Dylan's adoption. However, Allen remained distant from Farrow's other six children.

In 1986 Ms. Farrow expressed a desire to adopt another child. Mr. Allen, while not enthusiastic at the prospect of the adoption of Dylan in 1985, was much more amenable to the idea in 1986. Before the adoption could be completed Ms. Farrow became pregnant with the parties' son Satchel. While the petitioner testified that he was happy at the idea of becoming a father, the record supports the finding that Mr. Allen showed little or no interest in the pregnancy. It is not disputed that Ms. Farrow began to withdraw from Mr. Allen during the pregnancy and that afterwards she did not wish Satchel to become attached to Mr. Allen.

According to Mr. Allen, Ms. Farrow became inordinately attached to the newborn Satchel to the exclusion of the other children. He viewed this as especially harmful to Dylan and began spending more time with her, ostensibly to make up for the lack of attention shown her by Ms. Farrow after the birth of Satchel. Mr. Allen maintains that his interest in and affection for Dylan always has been paternal in nature and never sexual. The various psychiatric experts who testified or otherwise provided reports did not conclude that Allen's behavior toward Dylan prior to August of 1992 was explicitly sexual in nature. However, the clear consensus was that his interest in Dylan was abnormally intense in that he made inordinate demands on her time and focused on her to the exclusion of Satchel and Moses even when they were present.

The record demonstrates that Ms. Farrow expressed concern to Allen about his relationship with Dylan, and that Allen expressed his concern to Ms. Farrow about her relationship

with Satchel. In 1990 both Dylan and Satchel were evaluated by clinical psychologists. Dr. Coates began treatment of Satchel in 1990. In April of 1991 Dylan was referred to Dr. Schultz, a clinical psychologist specializing in the treatment of young children with serious emotional problems.

In 1990 at about the same time that the parties were growing distant from each other and expressing their concerns about the other's relationship with their youngest children, Mr. Allen began acknowledging Farrow's daughter Soon-Yi Previn. Previously he treated Ms. Previn in the same way he treated Ms. Farrow's other children from her prior marriage, rarely even speaking to them. In September of 1991 Ms. Previn began to attend Drew College in New Jersey. In December 1991 two events coincided. Mr. Allen's adoptions of Dylan and Moses were finalized and Mr. Allen began his sexual relationship with their sister Soon-Yi Previn.

In January of 1992, Mr. Allen took the photographs of Ms. Previn, which were discovered on the mantelpiece in his apartment by Ms. Farrow and were introduced into evidence at the IAS proceeding. Mr. Allen in his trial testimony stated that he took the photos at Ms. Previn's suggestion and that he considered them erotic and not pornographic. We have viewed the photographs and do not share Mr. Allen's characterization of them. We find the fact that Mr. Allen took them at a time when he was formally assuming a legal responsibility for two of Ms. Previn's siblings to be totally unacceptable. The distinction Mr. Allen makes between Ms. Farrow's other children and Dylan, Satchel and Moses is lost on this Court. The children themselves do not draw the same distinction that Mr. Allen does. This is sadly demonstrated by the profound effect his relationship with Ms. Previn has had on the entire family. Allen's testimony that the photographs of Ms. Previn "were taken, as I said before, between two consenting adults wanting to do this" demonstrates a chosen ignorance of his and Ms. Previn's relationships to Ms. Farrow, his three children and Ms. Previn's other siblings. His continuation of the relationship, viewed in the best possible light, shows a distinct absence of judgment. It demonstrates to this Court Mr. Allen's tendency to place inappropriate emphasis on his own wants and needs and to minimize and even ignore those of his children. At the very minimum, it demonstrates an absence of any parenting skills.

We recognize Mr. Allen's acknowledgment of the pain his relationship with Ms. Previn has caused the family. We also

note his testimony that he tried to insulate the rest of the family from the "dispute" that resulted, and tried to "deescalate the situation" by attempting to "placate" Ms. Farrow. It is true that Ms. Farrow's failure to conceal her feelings from the rest of the family and the acting out of her feelings of betrayal and anger toward Mr. Allen enhanced the effect of the situation on the rest of her family. We note though that the reasons for her behavior, however prolonged and extreme, are clearly visible in the record. On the other hand the record contains no acceptable explanation for Allen's commencement of the sexual relationship with Ms. Previn at the time he was adopting Moses and Satchel, or for the continuation of that relationship at the time he was supposedly experiencing the joys of fatherhood.

While the petitioner's testimony regarding his attempts to de-escalate the dispute and to insulate the family from it, displays a measure of concern for his three children, it is clear that he should have realized the inevitable consequences of his actions well before his relationship with Ms. Previn became intimate. Allen's various inconsistent statements to Farrow of his intentions regarding Ms. Previn and his attempt to have Dr. Schultz explain the relationship to Dylan in such a manner as to exonerate himself from any wrong doing, make it difficult for this Court to find that his expressed concern for the welfare of the family is genuine.

As we noted above, Mr. Allen maintains that Ms. Farrow's allegations concerning the sexual abuse of Dylan were fabricated by Ms. Farrow both as a result of her rage over his relationship with Ms. Previn and as part of her continued plan to alienate him from his children. However, our review of the record militates against a finding that Ms. Farrow fabricated the allegations without any basis. Unlike the court at IAS, we do not consider the conclusions reached by Doctors Coates and Schultz and by the Yale-New Haven team, to be totally unpersuasive. While the tendency of Dylan to withdraw into a fantasy and the inconsistencies in her account of the events of August 4, 1992, noted particularly by the Yale-New Haven team, must be taken into account in the evaluation of these serious allegations, the testimony given at trial by the individuals caring for the children that day, the videotape of Dylan made by Ms. Farrow the following day and the accounts of Dylan's behavior toward Mr. Allen both before and after the alleged instance of abuse, suggest that the abuse did occur. While the evidence in support of the allegations

remains inconclusive, it is clear that the investigation of the charges in and of itself could not have left Dylan unaffected.

Any determination of issues of child custody or visitation must serve the best interests of the child and that which will best promote the child's welfare (Domestic Relations Law § 70; *Eschbach v Eschbach,* 56 NY2d 167, 171; *Friederwitzer v Friederwitzer,* 55 NY2d 89, 93-94). The existence of a prior arrangement of custody agreed upon by the parties, should be given weighty but not absolute priority in the absence of extraordinary circumstances *(Matter of Nehra v Uhlar,* 43 NY2d 242, 251). Such priority is afforded in the belief that stability in a child's life is in the child's best interests *(Eschbach v Eschbach, supra,* at 171). The court, however is not bound by the existence of a prior agreement and has the discretion to order changes in custody as well as other modifications when the totality of circumstances warrants its doing so in the best interests of the child *(Eschbach, supra,* at 172). Primary among those circumstances is the quality of the home environment and the parental guidance the custodial parent provides for the child *(supra).* It has long been recognized that it is often in the child's best interests to continue to live with his or her siblings *(supra,* at 173). "While this, too, is not an absolute, the stability and companionship to be gained from keeping the children together is an important factor for the court to consider" *(supra,* at 173).

The weighing of the numerous factors to be considered "requires an evaluation of the testimony, character and sincerity of all the parties involved in this type of dispute" *(Eschbach, supra,* at 173). "Generally, such an evaluation can best be made by the trial court, which has direct access to the parties * * * Appellate courts should be reluctant to substitute their own evaluation of these subjective factors for that of the nisi prius court [citations omitted], and if they do, should articulate the reasons for so doing" *(supra,* at 173-174).

It was noted by the IAS Court that the psychiatric experts agreed that Mr. Allen may be able to fulfill a positive role in Dylan's therapy. We note specifically the opinion of Dr. Brodzinsky, the impartial expert called by both parties, who concluded that contact with Mr. Allen is necessary to Dylan's future development, but that initially any such visitation should be conducted in a therapeutic context. The IAS Court structured that visitation accordingly and provided that a further review of Allen's visitation with Dylan would be considered after an evaluation of Dylan's progress.

Although the investigation of the abuse allegations have not resulted in a conclusive finding, all of the evidence received at trial supports the determination as to custody and visitation with respect to this child. There would be no beneficial purpose served in disturbing the custody arrangement. Moreover, even if the abuse did not occur, it is evident that there are issues concerning Mr. Allen's inappropriately intense relationship with this child that can be resolved only in a therapeutic setting. At the very least, the process of investigation itself has left the relationship between Mr. Allen and Dylan severely damaged. The consensus is that both Mr. Allen and Ms. Farrow need to be involved in the recovery process. The provision for further review of the visitation arrangement embodied in the trial court's decision adequately protects the petitioner's rights and interests at this time.

With respect to Satchel, the IAS Court denied the petitioner's request for unsupervised visitation. While the court stated that it was not concerned for Satchel's physical safety, it was concerned by Mr. Allen's "demonstrated inability to understand the impact that his words and deeds have upon the emotional well being of the children". We agree. The record supports the conclusion that Mr. Allen may, if unsupervised, influence Satchel inappropriately, and disregard the impact exposure to Mr. Allen's relationship with Satchel's sister, Ms. Previn, would have on the child. His failure to understand the effect of such exposure upon Satchel as well as upon his other children is evidenced by his statement on direct examination in which he stated: "If you ask me personally, I would say the children, the children adore Soon Yi, they adore me, they would be delighted, if you asked me this personally, I would say they would be delighted and have fun with us, being taken places with us. But, I don't want to give you my amateur opinion on that. That's how I feel. And I know it counts for very little." The record indicates that Ms. Previn when not at college spends most of her time with Mr. Allen. Contact between Ms. Previn and her siblings in the context of the relationship with Mr. Allen would be virtually unavoidable even if Mr. Allen chose to insulate his children from the relationship. Expert medical testimony indicated that it would be harmful for Ms. Previn not to be reintegrated into the family. However, the inquiry here concerns the best interests of Dylan, Moses and Satchel. Their best interests would clearly be served by contact with their sister Soon-Yi, personally and not in Mr. Allen's presence. Seeing both Ms. Previn

and Mr. Allen together in the unsupervised context envisioned by Mr. Allen would, at this early stage, certainly be detrimental to the best interests of the children.

It has been held that the desires of the child are to be considered, but that it must be kept in mind that those desires can be manipulated (*Friederwitzer v Friederwitzer, supra,* at 94). In considering the custody and visitation decision concerning Moses, who is now a teenager, we cannot ignore his expressed desires. The record shows that he had a beneficial relationship with the petitioner prior to the events of December 1991. However, that relationship has been gravely damaged. While Moses' feelings were certainly affected by his mother's obvious pain and anger, we concluded that it would not be in Moses' best interests to be compelled to see Mr. Allen, if he does not wish to.

Therefore, we hold that in view of the totality of the circumstances, the best interests of these children would be served by remaining together in the custody of Ms. Farrow, with the parties abiding by the visitation schedule established by the trial court.

██ With respect to the award of counsel fees we note that the record demonstrates that Mr. Allen's resources far outpace those of Ms. Farrow. Additionally, we note the relative lack of merit of Mr. Allen's position in commencing this proceeding for custody. It became apparent, during oral argument, that there was serious doubt that Mr. Allen truly desired custody. It has been held that "in exercising its discretionary power to award counsel fees, a court should review the financial circumstances of both parties together with all the other circumstances of the case, which may include the relative merit of the parties' positions" (*DeCabrera v Cabrera-Rosete,* 70 NY2d 879, 881). We find no abuse of discretion in the court's award of counsel fees in this case.

Accordingly, the judgment of Supreme Court, New York County (Elliot Wilk, J.), entered July 13, 1993, which, *inter alia,* denied the petitioner Woody Allen's request for custody of Moses Amadeus Farrow, Dylan O'Sullivan Farrow, and Satchel Farrow, set forth the terms of visitation between the petitioner and his children and awarded Ms. Farrow counsel fees, is affirmed in all respects, without costs.

CARRO, J. (dissenting in part). I agree with the majority's conclusions, except for the affirmance of the order of visitation

with respect to Mr. Allen's son Satchel, which I find unduly restrictive.

There is strong evidence in the record from neutral observers that Mr. Allen and Satchel basically have a warm and loving father-son relationship, but that their relationship is in jeopardy, in large measure because Mr. Allen is being estranged and alienated from his son by the current custody and visitation arrangement. Frances Greenberg and Virginia Lehman, two independent social workers employed to oversee visitation with Satchel, testified how "Mr. Allen would welcome Satchel by hugging him, telling him how much he loved him, and how much he missed him." Also described by both supervisors "was a kind of sequence that Mr. Allen might say, I love you as much as the river, and Satchel would say something to the effect that I love you as much as New York City * * * then Mr. Allen might say, I love you as much as the stars, and Satchel would say, I love you as much as the universe." Sadly, there was also testimony from those witnesses that Satchel had told Mr. Allen: "I like you, but I am not supposed to love you;" that when Mr. Allen asked Satchel if he would send him a postcard from a planned trip to California with Ms. Farrow, Satchel said "I can't [because] Mommy won't let me;" and on one occasion when Satchel indicated that he wanted to stay with Mr. Allen longer than the allotted two-hour visit, "Satchel did say he could not stay longer, that his mother had told him that two hours was sufficient." Perhaps most distressing, Satchel "indicated to Mr. Allen that he was seeing a doctor that was going to help him not to see Mr. Allen anymore, and he indicated that he was supposed to be seeing this doctor perhaps eight or ten times, at the end of which he would no longer have to see Mr. Allen."

In contrast to what apparently is being expressed by Ms. Farrow about Mr. Allen to Satchel, Mr. Allen has been reported to say only positive things to Satchel about Ms. Farrow, and conveys only loving regards to Moses and Dylan through Satchel. Thus I find little evidence in the record to support the majority's conclusion that "Mr. Allen may, if unsupervised, influence Satchel inappropriately, and disregard the impact exposure to Mr. Allen's relationship with Satchel's sister, Ms. Previn, would have on the child." (Majority opn, at 334.)

The majority's quotation of Mr. Allen's testimony with respect to Soon-Yi in support of its conclusion respecting

visitation should be viewed in the context of Dr. David Brodzinsky's testimony. Dr. Brodzinsky is an expert in adoption with considerable experience in court-related evaluations of custody and visitation disputes, who was retained by the guardian for Dylan and Moses in a pending Surrogate's Court proceeding involving the parties. Dr. Brodzinsky was thus a completely neutral expert, jointly called by Mr. Allen and Ms. Farrow, and he had extensive contact with the relevant family members and mental health professionals and reviewed the pertinent reports and transcripts prior to testifying. It was his clinical judgment that Mr. Allen had more awareness of the consequences of his actions than he was able to articulate in the adversarial process, and he was optimistic about Mr. Allen's ability to accept his share of responsibility for what had taken place in light of his love for his children, his capacity for perspective-taking and empathy, and his motivation and openness toward the ongoing therapeutic process. In addition, Dr. Susan Coates, Satchel's therapist until December 1992, and the only expert to testify about Satchel's mental health, stated that Mr. Allen's parental relationship with Satchel was essential to Satchel's healthy development.

"It is the firmly established policy of this State * * * that, wherever possible, the best interests of a child lie in his being nurtured and guided by both of his natural parents." *(Daghir v Daghir,* 82 AD2d 191, 193 [Mollen, P. J.], *affd* 56 NY2d 938.) "Simply stated, a parent may not be deprived of his or her right to reasonable and meaningful access to the children by the marriage unless exceptional circumstances have been presented to the court * * * [i.e.,] where either the exercise of such right is inimical to the welfare of the children or the parent has in some manner forfeited his or her right to such access." *(Strahl v Strahl,* 66 AD2d 571, 574 [Titone, J.], *affd* 49 NY2d 1036.)

I do not believe that Mr. Allen's visitation with Satchel for a mere two hours, three times a week, under supervision, is reasonable and meaningful under the circumstances, or that exceptional circumstances are presented that warrant such significant restriction on visitation with Satchel. Mr. Allen and Satchel clearly need substantial quality time together to nurture and renew their bonds and to foster a warm and loving father-son relationship. Obviously this cannot occur overnight; but more significantly, it is almost inconceivable that it will occur even over an extended period of time if visitation is limited to three two-hour periods per week under

the supervision of strangers, as ordered by the trial court and affirmed by the majority. Accordingly I would modify the judgment appealed from to provide that Mr. Allen shall have unsupervised visitation with Satchel for four hours, three times weekly, plus alternate Saturdays and Sundays for the entire day, plus alternate holidays to be agreed upon by the parties *(see, Cesario v Cesario,* 168 AD2d 911; *Shink v Shink,* 140 AD2d 506; *Armando v Armando,* 114 AD2d 875).

Motion 104 by respondent-respondent to strike portions of appellant's reply brief is denied.

Cross motion 229 by appellant for costs and counsel fees in responding to motion 104 denied.

MURPHY, P. J., and SULLIVAN, J., concur with Ross, J.; CARRO and WALLACH, JJ., dissent in part in an opinion by CARRO, J.

Judgment, Supreme Court, New York County, entered July 13, 1993, affirmed, without costs.

Motion to strike portions of reply brief is denied.

Motion for costs and fees is denied.