[628 NYS2d 957]

EILEEN YOUNG, Respondent, v STEPHEN YOUNG, Appellant.

Second Department, June 26, 1995

APPEARANCES OF COUNSEL

*Vitale, Levitt & McCarthy, P. C.,* Huntington *(Paul E. Levitt* of counsel), for appellant.

*Arthur Levine,* Garden City, for respondent.

*Alfred Reinharz,* Baldwin, *Law Guardian,* for infants.

### OPINION OF THE COURT

BALLETTA, J. P.

It has been observed by our Court that "[t]he natural right of visitation jointly enjoyed by the noncustodial parent and the child is more precious than any property right" *(Resnick v Zoldan,* 134 AD2d 246, 247) and that "the best interests of the child would be furthered by the child being nurtured and guided by both of the natural parents" *(Bostinto v Bostinto,* 207 AD2d 471, 472). Indeed, a custodial parent's interference with the relationship between a child and a noncustodial parent has been said to be "an act so inconsistent with the best interests of the child as to per se raise a strong probability that the offending party is unfit to act as a custodial parent" *(Maloney v Maloney,* 208 AD2d 603, 603-604). Such interference with the relationship between a child and a noncustodial parent can take many forms, the obvious being the outright denial of visitation by making the child physically unavailable at the appointed time. However, the instant case involves a more subtle and insidious form of interference, a form of interference which, in many respects, has the potential for greater and more permanent damage to the emotional psyche of a young child than other forms of interference; namely, the psychological poisoning of a young person's mind to turn him or her away from the noncustodial parent. In this case, if left with their mother, the children would have no relationship with their father given the mother's constant and consistent single-minded teaching of the children that their father is dangerous. She has demonstrated that she is unable and unwilling to support the father's visitation; and it was, therefore, an improvident exercise of discretion to deny the father's petition for a change of custody.

The parties herein, Eileen Young (now Miller) and Stephen Young (hereinafter the mother and the father, respectively),

were married on August 21, 1982, and had four children together: Stephen, Jr., born March 12, 1983 (now 12 years old); Melissa, born August 28, 1984 (now 10 years old); Bryan, born November 21, 1985 (now 9 years old); and Emily, born September 29, 1987 (now 7 years old). The father left the marital residence in November 1988, and a divorce action was commenced the following month. Following a trial on the issues of equitable distribution, support, and maintenance held in April 1991, a memorandum decision was issued on June 1, 1992. Although the father had, during the early stages of the divorce action, stipulated to the mother having custody of the children, he moved, by order to show cause dated June 17, 1992, *inter alia*, for a change of custody to him, with the mother to be given only supervised visitation based upon what he claimed to be the mother's "bizarre and dangerous behavior" which was "calculated to destroy the children's relationship with [him]".

In primary part, the father referred to the mother's persistent and uncorroborated allegations that he was sexually abusing their children, her continuing to make new claims of abuse even though all other claims had been determined to be unfounded. He suggested the possibility that the mother herself may have caused the youngest child's vaginal and rectal area to become reddened prior to the mother's bringing her to the hospital. The father further noted the mother's ongoing interference with visitation by various other means, including making accusations of sexual abuse and warning him not to engage in such activities in the presence of the children. In the father's view, a change in custody was critical to the children's well-being and mental health.

The mother opposed the application, and the matter was subsequently referred for a hearing before Judicial Hearing Officer Marchese. Since the original Law Guardian had died in the interim after having issued his report in the matrimonial matter recommending that the father have unsupervised visitation, the court appointed a new Law Guardian for the children, Alfred Reinharz, Esq., as well as a psychiatrist, Marc Reubins, M.D., to conduct forensic examinations and to make a recommendation as to custody.

In the meantime, while waiting for the forensic evaluations to be concluded, the father sought to have visitation extended to include overnight visits. However, given the pendency of the proceedings and upon the recommendation of the Law Guardian, the court denied the application, notwithstanding

the fact that the previously raised claims of abuse had been determined to be unfounded.

Thereafter, the mother made an application by order to show cause dated May 13, 1993, to modify the father's visitation and to suspend visitation with the youngest child, Emily, based upon a new charge of sexual abuse against the father involving Emily which was alleged to have occurred during a May 2, 1993 visit. Pending the determination of this application, visitation with Emily was suspended, and the court subsequently indicated that it meant to suspend visitation with all of the children pending a hearing thereon. It does appear from the record, however, that visitation with the other children was subsequently reinstated, as was visitation with Emily at a later point.

While this latter matter, visitation, was related to the main application, the court indicated that it would hear them separately but eventually did combine the two.

Following the hearings, which spanned approximately one and one-half years, and notwithstanding the recommendations of both the Law Guardian and the court-appointed psychiatrist in favor of transferring custody to the father, the court ruled, on August 31, 1994, that custody should remain in the mother.

With respect to appellate review of a custody determination, it has been observed that the Appellate Division's "authority in custody matters is as broad as that of the trial court" *(Matter of Rosiana C. v Pierre S.,* 191 AD2d 432, 433; *see, Matter of Krebsbach v Gallagher,* 181 AD2d 363, 364; *Linda R. v Richard E.,* 162 AD2d 48, 50).* While due deference is often accorded to the trial court, which has seen and evaluated the evidence and witnesses first hand, the overriding concern is always the best interests of the children, and an "appellate court would be seriously remiss if, simply in deference to the finding of a Trial Judge, it allowed a custody determination to stand where it lacks a sound and substantial basis in the record and, indeed, is contrary to the weight of the credible evidence" *(Matter of Gloria S. v Richard B.,* 80 AD2d 72, 76; *see also, Matter of Rosiana C. v Pierre S., supra,* at 433; *Fox v Fox,* 177 AD2d 209, 211-212; *Keating v Keating,* 147 AD2d 675, 677).

As is relevant to this case, among the factors to be considered by the court in making a custody determination are: "the parental guidance the custodial parent provides for the child;

the ability of each parent to provide for the child's emotional and intellectual development; the financial status and ability of each parent to provide for the child; [and] the overall relative fitness of the parties" *(Matter of Rosiana C. v Pierre S., supra,* at 434; *see also, Eschbach v Eschbach,* 56 NY2d 167, 172-173). Additionally, "the effect that an award of custody to one parent might have on the child's relationship with the other parent" is also a proper and relevant consideration *(Bliss v Ach,* 56 NY2d 995, 998).

"[T]he existence or absence of any one factor cannot be determinative on appellate review since the court is to consider the totality of the circumstances" *(Eschbach v Eschbach, supra,* at 174). In the end, any determination of child custody must be based upon "what is for the best interest of the child, and what will best promote its welfare and happiness" (Domestic Relations Law § 70 [a]; *see also, Eschbach v Eschbach, supra,* at 171).

Applying these basic and well-known legal principles to this case, we find that the trial court's determination denying the father's application for a change of custody (primarily due to the mother's interference with visitation and unfounded accusations against him of sexual abuse of their children) was an improvident exercise of discretion in view of the record which included recommendations by both the court-appointed psychiatrist and the Law Guardian that the father be given custody of the four minor children.

While it is true that the recommendations of court-appointed experts are but one factor to be considered in making any custody determination and are not determinative *(see, Matter of Prete v Prete,* 193 AD2d 804), such recommendations are entitled to some weight *(see generally, Bluemke v Bluemke,* 155 AD2d 574, 575; *Asher v Asher,* 79 AD2d 904, 905; *Guzzo v Guzzo,* 66 AD2d 833), as is the case with respect to the recommendations and findings of the court-appointed Law Guardian *(see, e.g., Keating v Keating,* 147 AD2d 675, 678, *supra; Matter of Burke v White,* 126 AD2d 838, 841), unless such opinions are contradicted by the record *(see, Rentschler v Rentschler,* 204 AD2d 60). Indeed, in *Linda R. v Richard E.* (162 AD2d 48, 56, *supra),* this Court reversed a custody determination due in part to the trial court's failure to consider or to adequately explain why it failed to consider the recommendations of the neutral experts, stating: "The Supreme Court set forth no convincing reasons for discounting the court-requested psychiatric evaluation of all family members, as

well as the evaluation by the Nassau County Probation Department recommending that the wife be given custody of the children. Contrary to the Supreme Court's findings, the recommendation of these investigators—the only disinterested individuals who had examined both parties and the children—was based on a full exploration of the parties' lives and problems".

In this case, after having spent approximately 56 hours meeting with and evaluating the parties and the children, Dr. Marc Reubins, the court-appointed psychiatrist, was of the opinion that it was "not in the best interest of the children to remain living in the house with their mother as she is thoroughly incapable of supporting a relationship between the children and their father and has demonstrated this incapacity over the past four years with consistent effort and diligence". Inexplicably, the trial court ignored this unequivocal testimony and recommendation of Dr. Reubins. In its decision, the court stated that "neither Dr. Reubins nor the Law Guardian concluded that the mother was materially less fit as a parent". Yet, the record is completely to the contrary. In as clear language as possible, Dr. Reubins testified that, "she's unfit, and that's why I'm saying the kids shouldn't live with her".

Moreover, in rejecting the recommendation of the court-appointed psychiatrist, the trial court herein stated that, "There is no convincing or dependable psychiatric evaluation for the court to accept and rely on in making the custody determination". It is evident that the court completely disregarded Dr. Reubins' recommendation; and, without any discernible reason or basis in the record to support such a determination, its conclusion is nothing short of arbitrary (see, Matter of Harvey v Share, 119 AD2d 823, 824).

Furthermore, the court chose not only to disregard and ignore the very strong and unequivocal opinion of Dr. Reubins, it also based its determination on the opinion of the mother's expert, a Dr. Green, whose own evaluation was concededly flawed. Dr. Green himself, who had interviewed the mother and children for only a few hours over a two-week period in February 1994, admitted that his qualification to make a custody recommendation was limited since he had not seen both parents and he had not seen the children interact in the presence of both parents. Under these circumstances, little or no weight should have been accorded to his recommendation that custody be awarded to the mother (see, Matter of

*Rebecca B.,* 204 AD2d 57; *Matter of Williams v Williams,* 188 AD2d 906; *Frank R. v Deborah Ann R.,* 204 AD2d 615).

In the case at bar, Dr. Reubins performed the only complete evaluation of the parties and children as the court-appointed forensic expert. His opinion was strong, firm, competent, weighty, and unbiased. Since Dr. Green's testimony was of limited probative value, there was, in essence, no qualified expert opinion to contradict the recommendation of Dr. Reubins. Thus, in this respect, the trial court's decision, which entirely disregards and ignores the very strong and unequivocal expert opinion and recommendation of Dr. Reubins, lacks a sound and substantial basis.

In addition to rejecting without explanation the recommendation of its own impartial psychiatric expert, the trial court also dismissed the equally compelling recommendation of the appointed Law Guardian. The court's criticism of the Law Guardian's recommendation was primarily centered upon the Law Guardian's perceived failure "to touch upon the mother's fitness as a parent". Yet, in his report, the Law Guardian clearly articulated reasons as to why he thought that the mother was unfit, and those reasons clearly had to do with the mother's interference with the father's visitation with the children. The Law Guardian unequivocally recommended that the custody of the children be transferred to the father and that the mother should only have supervised visitation.

We now turn to the underlying basis for both Dr. Reubins' and the Law Guardian's recommendations for a change of custody; namely, the mother's constant interference with the father's visitation with the children. While the mother's interference took on many forms (e.g., the mother frequently made other plans or arrangements for the children on the dates and times that the father was to have visitation), its most pernicious form was the numerous false allegations of sexual abuse made by the mother against the father.

Initially, it should be noted that Mr. Benjamin Malewicz, a caseworker with the Child Protective Services of the Nassau County Department of Social Services, testified that during the course of his investigation into an incident that allegedly occurred in October 1993, he had learned that there had "been numerous sexual abuse charges filed, somewhere in the number of seven different reports, and that they [had] all come back unfounded". This confirmed the earlier testimony of Mr. Mark Clavin, a senior investigative caseworker for the

Child Protective Services of the Suffolk County Department of Social Services, who had stated that he had been aware that other sexual abuse charges had been filed with respect to the Young children and that all had proven to be unfounded. Clavin also indicated that the May 1993 incident that he had investigated was also unfounded. Dr. Reubins' report also noted the numerous allegations of sexual abuse made by the mother to Child Protective Services which had been unfounded. Moreover, a hearing had been held in April 1992, in Suffolk County Family Court, with respect to two alleged instances of sexual abuse, after which the Family Court dismissed the mother's petition for an order of protection.

In addition, during the course of the trial, the mother presented the testimony of three medical doctors, all pediatricians, in an attempt to bolster her claims of abuse. Significantly, none of the three would confirm that there had been abuse. Indeed, Dr. O'Rourke, who was Emily's regular pediatrician, testified that she had examined Emily on April 9, May 4, and May 8, 1992, and that all three examinations had been normal with no signs of abuse. Dr. Dominquez, a pediatrician at the Nassau County Medical Center who examined (and photographed) Emily on May 3, 1993, testified that although she had found some evidence of "tunneling with traction", such a condition was equally consistent with a finding of constipation and by itself was not consistent with an allegation of abuse. The third doctor, Dr. Ford, also a pediatrician at the Nassau County Medical Center, testified that she had examined Emily on January 1, 1994, and found no evidence of abuse.

These repeated uncorroborated and unfounded allegations of sexual abuse brought by the mother against the father cast serious doubt upon her fitness to be the custodial parent. Moreover, during the course of her unrelenting campaign against the father, the mother has subjected the youngest child, Emily, to numerous physical examinations including the probing and photographing of her private parts, and culdoscopies. Furthermore, during an in camera interview, Emily told the court that her mother reminded her every night that her father hurt her and that her mother would not let her father have visitation "because then my mom said he would learn his lesson".

The mother's testimony was devoid of any understanding or recognition of why it is important for her children to have a relationship with their father. As Dr. Reubins indicated in his

report: "It has become eminently clear that if the four children of the Young marriage are left in the care of Mrs. Miller, they will not only have no relationship with their biological father, but they will grow up in an environment where they are taught that he is a devilishly perverse parent who offers them an ever-present threat of abuse. There is clear information to support Mrs. Miller's everyday teaching of this to her children without the slightest appreciation of how that distorts their view of themselves, her past or their father. She sees only before her the obligation to protect her children from her fear with no appreciation that the totality of allegations she has raised have been unfounded. She is single-minded in trying to teach the children how dangerous their father is and through that single-minded preoccupation does not allow them to form any type of neutral relationship with their father. Mrs. Miller has been thoroughly unable to support visitation between the children and their father or to engage the children with their father in any way that would support any relationship whatsoever".

Although the trial court heard the testimony of both expert and nonexpert witnesses as to the problems with the father's visitation and had the benefit of Dr. Reubins' report, its decision was noticeably silent as to the mother's persistent interference with visitation. It is clear that the court failed to consider the overwhelming evidence that the mother consistently and willfully interfered in the father's relationship with the children.

It is well established that such interference with the relationship between a child and the noncustodial parent has been said to be " 'an act so inconsistent with the best interests of the children as to, per se, raise a strong probability that the [offending party] is unfit to act as custodial parent' " *(Daghir v Daghir,* 82 AD2d 191, 194, *affd* 56 NY2d 938). This is in recognition of the principle that visitation is a joint right of both the noncustodial parent and the child and that the best interests of the child would be furthered by being nurtured and guided by both of the natural parents *(see, Bostinto v Bostinto,* 207 AD2d 471, *supra).* Moreover, "[o]ne of the primary responsibilities of a custodial parent is to assure meaningful contact between the children and the other parent" *(Matter of Raybin v Raybin,* 205 AD2d 918, 921), and the willingness of a parent to assure such meaningful contact between the children and the other parent is a factor to be considered in making a custody determination *(see, O'Connor v*

*O'Connor,* 146 AD2d 909, 910; *Lohmiller v Lohmiller,* 140 AD2d 497, 498).

In this case, it is clear that the mother's anger and hostility toward the father has made her unfit to be the custodial parent "since her attitude would substantially interfere with her ability to place the needs of the children before her own in fostering a continued relationship with the noncustodial parent" *(Janecka v Franklin,* 150 AD2d 755, 757; *also, Matter of Mahoney v Marrano,* 134 AD2d 834). The mother's conduct in the instant case was so egregious as to warrant a change of custody to the father *(see, Landau v Landau,* 214 AD2d 541; *Matter of Betancourt v Boughton,* 204 AD2d 804; *Matter of Beyer v Tranelli-Ashe,* 195 AD2d 972; *Matter of Carl J. B. v Dorothy T.,* 186 AD2d 736).

In view of the mother's consistent preaching to the children that their father was an evil and dangerous man, the trial court incorrectly placed emphasis on the children's desire to remain with the mother. A child's preference for a particular parent, while a factor to be considered, cannot be determinative *(see, Darema-Rogers v Rogers,* 199 AD2d 456; *Zucker v Zucker,* 187 AD2d 507). In weighing the child's expressed preference, "the court must consider the age and maturity of the child and the potential for influence having been exerted on the child [citations omitted]" *(Eschbach v Eschbach,* 56 NY2d, *supra,* at 173). This is particularly true in a case such as this where there is overwhelming evidence "that the children's feelings were fostered by the [mother's] hostility towards the [father]" *(Bubbins v Bubbins,* 136 AD2d 672; *also, Zelnik v Zelnik,* 196 AD2d 700; *O'Connor v O'Connor,* 146 AD2d 909, *supra).* "The desires of young children, capable of distortive manipulation by a bitter, or perhaps even wellmeaning, parent, do not always reflect the long-term best interest of the children" *(Matter of Nehra v Uhlar,* 43 NY2d 242, 249).

Moreover, the court also placed undue emphasis on the factor of stability, expressing its belief that a change of custody would be extremely disruptful to the children. Although stability has been found to be in a child's best interests *(see, Friederwitzer v Friederwitzer,* 55 NY2d 89, 94), it also cannot be determinative. For, as the Court of Appeals has since observed, while stability is an important consideration, "the disruption of change is not necessarily conclusive" *(Matter of Louise E. S. v W. Stephen S.,* 64 NY2d 946, 947).

"That a change in custody may prove temporarily disruptive to the children is not determinative, for all changes in custody are disruptive" *(Matter of Nehra v Uhlar, supra,* at 248). The record herein reflects the fact that Dr. Reubins carefully considered and thoroughly answered the questions of stability and disruption in making his recommendation. Furthermore, under the circumstances of this case, where there was clear evidence of the manipulation of the children by the mother, stability should not have been an overriding factor in the court's decision *(see, Matter of Sliwinski v Erie County Dept. of Social Servs. [Sliwinski],* 195 AD2d 1056; *Matter of Erck v Erck,* 147 AD2d 921).

Within the context of our discussion of the role that stability plays in making a custody determination, we would note that while it is often said that the original agreement by the parties as to custody should be afforded priority, " 'not as an absolute but as a weighty factor' ", such an agreement should not be to the exclusion of a careful weighing of the children's best interest *(Eschbach v Eschbach,* 56 NY2d, *supra,* at 171-172; *also, Allen v Farrow,* 197 AD2d 327, 333; *Matter of Patsy M. C. v Lorna W. C.,* 165 AD2d 813, 814). In view of the other evidence in this case, the parties' original agreement concerning custody was not conclusive *(see, Matter of Rozelle v Rozelle,* 184 AD2d 973).

Finally, we note that the trial court based its decision partly upon the view that: "The nurturing and care a natural mother can give her children cannot be provided by anyone other than the mother and only with the expected support and unselfish understanding by a father; in this instance, the father, the breadwinner, is busily engaged in earning a living. He could not possibly give the four children the care and attention the mother has given".

However, as this Court has held in the past: "In enacting the 'best interests of the child' test, the Legislature expressly rejected the idea that either fatherhood or motherhood alone carries with it a superior right to custody *(see,* Domestic Relations Law §§ 70, 81, 240). The statutory declaration that there is 'no prima facie right to the custody of the child' (Domestic Relations Law §§ 70, 240) rejects the notion that there is an inherent custodial preference for either parent" *(Linda R. v Richard E.,* 162 AD2d 48, 53, *supra; see also, Setty v Koeneke,* 148 AD2d 520, 521; *Alan G. v Joan G.,* 104 AD2d 147, 152).

Moreover, "a custody determination cannot be based upon

any unfounded presumption that a father is a less than satisfactory parent because he is employed while the mother is unemployed" *(Matter of Bogert v Rickard,* 199 AD2d 587, 588-589; *also, Matter of King v King,* 166 AD2d 750). The language of this Court's decision in *Nir v Nir* (172 AD2d 651, 652-653) is of particular relevance to the case at bar: "While we are mindful that the Supreme Court also expressed concern over the husband's lack of 'hands on' parenting experience, when this deficiency is balanced against the evidence concerning the wife's psychological disorder, and her pattern of distorting the truth, it cannot be gainsaid that the Supreme Court's decision is supported by a sound and substantial basis in the record, and thus should not be disturbed".

It should be noted that in *Nir v Nir (supra,* at 652), this Court affirmed an award of custody to the father where, *inter alia,* "[t]he wife made numerous allegations concerning sexual abuse of the child by the husband and his parents, the husband's hospitalization in a psychiatric facility, the husband's repeated rape of her during the marriage, and other grave accusations, all of which were unsubstantiated".

As noted above, the trial court ignored the recommendations of both the court-appointed psychiatrist and the Law Guardian. The trial court summarily and arbitrarily disregarded the credible and substantial testimony of Dr. Reubins as to the mother's interference with the father's visitation and the danger to the children as a result of her actions. Finally, the court disregarded testimony and other evidence that called into question the mother's behavior.

For all of the above reasons, the Court's determination must be reversed insofar as appealed from and custody granted to the father. Moreover, in view of our determination, the matter must be remitted to the Supreme Court, Nassau County, for a hearing before a different Justice on the issue of visitation for the mother and the entry of an appropriate order terminating the father's obligation for child support.

O'BRIEN, THOMPSON and GOLDSTEIN, JJ., concur.

Ordered that the order is reversed insofar as appealed from, as a matter of discretion in the interests of justice, with costs, the motion is granted, and the matter is remitted to the Supreme Court, Nassau County, for a hearing before a different Justice on the issue of visitation for the mother and the entry of an appropriate order terminating the father's obligation for child support.