OPINION OF THE COURT
Jeffrey S. Sunshine, J.
More than 20 years ago the Appellate Division, First Depart *385 ment, in Perlstein v Perlstein (76 AD2d 49, 53 [1980]) held “a custody proceeding should not deteriorate into a war between parents to establish the superiority of different life-styles.” Today this court comes to the very same conclusion in this very litigious, very acrimonious visitation dispute between a Hasidic father and Orthodox Jewish mother.
The gravamen of the action before the court is to determine the appropriate visitation that the father should have with his now 10-year-old daughter who resides with the mother and the visitation that the now 14-year-old son who resides with his father should have with his mother.
The issues are complicated by a vexing dispute over the level of religious observance that each of the parties believes is appropriate, the effect that the dispute has upon the children and the relentless hate, rancor and bitterness that each party displays for the other.
The parties were married in August of 1985 and divorced pursuant to a judgment of divorce signed on February 15, 1995. The judgment was incorporated in a stipulation of settlement signed by the parties but not acknowledged in the form of a deed. Apparently the father was represented by counsel and the mother appeared pro se.
The divorce judgment provided that the father would have custody of the son Joseph and the mother would have custody of the daughter Esther. The father has been raised in accordance with Hasidic teachings, the mother in accordance with Orthodox teachings.
It is undisputed that for four years neither party sought to enforce the visitation schedule enunciated in the stipulation and judgment and the parties devised an ad hoc visitation schedule which in effect provided for decreasing amounts of time that Joseph would spend with his mother and a decreasing amount of time that Esther would spend with her father. It is alleged that for the first two years following the divorce the mother did not visit with Joseph at all and after that period of time he visited her two days each week (one weekday and Sunday). It is further alleged that the daughter Esther did spend alternate Sabbaths (referred to as Shabbos) with her father and some time during the week. It is undisputed that the mother, during the course of the litigation, further decreased the amount of time the daughter visited with the father, and the son, allegedly on his own volition, decreased the amount of time that he spent with his mother. The mother *386 as of late has refused to allow the daughter to be with her father on Sabbath and Jewish holidays. The father credibly testifies that he has encouraged the son to visit, but the son is reluctant. It is clear that the son’s actions preceded the mother’s curtailment of the daughter’s visitation.
The parties in 1999 sought judicial intervention in the Family Court, the father moving, inter alia, first for custody of Esther. The father, during the course of the litigation but prior to trial, withdrew his request for custody of the parties’ daughter and sought enforcement of his visitation with Esther and filed for modification of the mother’s schedule of visitation with the son Joseph. Thereafter, the mother sought to enforce her scheduled visitation with Joseph.
Each child was appointed an independent Law Guardian and a forensic evaluator was appointed by the court pursuant to a stipulation entered into by the parties.
It must be noted at the outset that it is not this court’s position that visitation disputes should always result in the appointment of a forensic evaluator. It was clear to this court that, in this instance, the level of hostility and rancor rose to such a level that the court believed that it was appropriate to appoint an independent forensic evaluator. The court held an in camera interview with each of the children separately. Joseph was extremely vocal and strong willed in his views and position. Esther refused to speak with the court and the in camera was halted. It is clear to this court that both children during the course of this litigation have been utilized by their respective custodial parents as pawns to communicate their discord and position to each other and the court.
Any discussion about an appropriate level of religious observance during periods of visitation must be viewed in the context of this court’s role under the United States constitutionally mandated separation of Church and State. (US Const 1st Amend; NY Const, art I, § 3.) It must be noted though that the New York State Court of Appeals has held that the Establishment Clause is not violated when neutral principles of law can be utilized to resolve a dispute without reference to religious doctrine. (See, Park Slope Jewish Ctr. v Congregation B’nai Jacob, 90 NY2d 517 [1997].) Any consideration of the religious principles of the children must therefore be viewed in the context of the best interests of the child, for in visitation disputes, like custody matters, the best interest of the child is the controlling factor. (Eschbach v Eschbach, 56 NY2d 167 [1982].) The court will not examine or rule on the appropriate *387 ness of the religious practice or belief. Nor will the court determine the appropriate level of religious belief, but the court must consider the impact that a parent’s conduct has on the child especially in light of the parties’ intent as regarding religion described in their agreement, and the consistency necessary for the children in light of their upbringing including the lifestyle they have been taught.
The case law is clear that courts may venture into and consider the religious practices of the parties in custody determinations in determining what is in the best interest of the child. In fact, in Friederwitzer v Friederwitzer (55 NY2d 89, 93 [1982]), the New York Court of Appeals ruled that “[t]he only absolute in the law governing custody of children is that there are no absolutes.” The Court affirmed a lower court decision which held that a mother “was less fit to have custody than the father because her own best interests and social life appeared to be of ‘paramount concern to her, to the total exclusion of the best interests of her children.’ ” (Supra, at 92.) Similar to the case at bar, Friederwitzer involved two Orthodox Jewish parents and the mother allowed actions which violated the religious upbringing and agreement of the parties. The Court of Appeals noted that the mother’s actions “confused the children and [were] contrary to their religious beliefs and detrimental to their religious feeling.” (Supra, at 93.)
In our increasing and complex society, where divorce and separation are an ever more prevalent phenomenon, courts cannot ignore that these same concerns which are present in custody disputes are also of concern in visitation disputes.
Herein the court must make similar determinations as it relates to visitation, for a visitation that is fraught with hostility, destruction of property, indoctrination, posturing, pressure and conflict impacts greatly upon a child.
The father has raised Joseph in accordance with strict Hasidic principles. The mother has raised Esther in accordance with Orthodox Jewish principles. Joseph wears traditional Hasidic garb and his hair is maintained in accordance with the Hasidic principle of payus (ear locks). He attends a Hasidic Yeshiva. His classes begin very early in the morning and he gets up before the sun rises to get ready for school, say his prayers and partake in religious ceremonies. He arrives home at night, usually after dark by school bus. This fall, Joseph, like many other 14-year-old boys in his community, will be attending boarding school away from home during the week and will be home Thursday evening, Friday, Saturday (the Sabbath *388 starts at sundown on Friday and ends shortly after sunset on Saturday night) and Sunday morning.
The mother refers to Joseph as being too Hasidic and a fanatic. She believes that Joseph has been emotionally harmed and is problematic because of his level of observance. Joseph has been having difficulties in school. The father believes that the mother is violating the stipulation by not raising the daughter in accordance with strict Orthodox principles.
There is no doubt that the mother is dismayed and hurt by what she perceives to be the loss of her son to his Hasidic father, yet it was clear from the testimony that, at the time of the marriage and the divorce, the father would raise the son as Hasidic.
The stipulation, which was incorporated into the judgment (Rigler, J.) by reference and survived the judgment and did not merge, provided for reasonable and liberal visitation centered around the Sabbath and Jewish holidays.
Certainly, the parties’ intent as to visitation and that the children were to be raised in accordance with Orthodox Jewish principles has been established by the testimony. The stipulation provides the court with guidance as to the parties’ intent but the stipulation is certainly not binding, since it was not “acknowledged or proven in the manner required to entitle a deed to be recorded.” (See, Domestic Relations Law § 236 [B] [3]; Matisoff v Dobi, 90 NY2d 127 [1997].)
Notwithstanding same, the stipulation, when coupled with the testimony of the parties, clearly shows the parties’ intent. The present circumstances involving the parties’ visitation or lack thereof and their relationships with their children clearly warrant the court’s intervention.
There is tremendous anger and hostility between Joseph and his mother. He is angered by what he perceives to be his mother’s abandonment of him as described by Dr. David. In his report, Dr. David states “underneath his anger is his need for a mother.” The forensic evaluator also states that “Joseph feels his mother hates him and goes out of [her] way to embarrass him.” The doctor interestingly notes that “Joseph’s anger toward his mother is genuine and is only partially influenced by her current lifestyle.”
It is clear from the testimony that Joseph has been severely affected by the open warfare that exists between his mother and father which is complicated by the fact that the school and those around Joseph who influence him on a daily basis have taught Joseph to reject his mother’s lifestyle.
*389 Instead of attempting to overcome that influence by reaching a compromise so as not to alienate Joseph and his beliefs, it is clear from the testimony that she has openly attacked Joseph and his beliefs directly and indirectly by attacking his father’s level of religious observance and even directly attacking Joseph and his religious practices. She clearly conducts herself in a manner in front of Joseph which clearly offends him because it is inapposite to that which he has been taught. Joseph views her as a sinner who must repent in order to regain his favor, love and affection.
Instead of trying to make Joseph more comfortable during these short periods of visitation, and realizing that she can have her own religious beliefs and practices independent of him, she encourages open defiance with the principles Joseph has been taught and indoctrinated with. The visitations have become so fraught with hostility that on one occasion Joseph resorted to destroying property with a broom.
Certainly the mother has an absolute right to observe or not observe any practices she wishes but she does not have the right to interfere with her minor son’s level of religious practice and belief. The mother is so intent on rejecting the father’s beliefs that she does not consider the effect this is having on her children.
The father is not blameless in allowing the visitation to reach such a level of hostility. Instead of attempting to work out a compromise or assist Joseph in reaching an amicable solution with the mother, it is uncontradicted that both parties refused to talk to each other for years, thus placing the children in the position of being the message bearers. The father testified credibly that he would want his son to visit with the mother yet he appears to be “putting his head in the sand” by believing that this could occur without incident given the child’s present view toward his mother. The father also has an obligation to assure that the mother’s level of religious observance is respected by him and Joseph. He too has an obligation to make sure that Esther is not taught that her mother’s beliefs are unacceptable. There is no doubt that he is more sincere and credible than the mother in his desire to reach some level of peace and compromise for the sake of family.
Complicating this enormously emotional and hostile relationship with the son, the mother has interfered with, and refused to allow the parties’ daughter to have, visitations on a Sabbath or holidays with the father. Joseph, clearly angered by this, believes he has an obligation to protect his sister from *390 what he perceives to be the untoward ways of his mother. No one has taught him that life is not absolute and compromises can be reached to accommodate different beliefs. Both parties have an obligation to teach their children that because a parent or child’s beliefs and practices are different does not mean that they are bad or evil. Each parent has the right to practice their religious beliefs in accordance with their own desires and wishes and each parent has an obligation to minimize conflict between each other and the children during periods of visitation so as not to make the child feel uncomfortable or that they are acting in an inappropriate manner. It is no doubt a difficult balancing act but it is the obligation that a parent has toward a child. That obligation includes putting one’s own needs aside in the best interests of the child while the child is visiting with a noncustodial parent.
The parents, by their initial determination and the clear lifestyle by which they lived before and after the divorce, exposed the children to a certain religious lifestyle. They now must honor that decision when in the presence of their children for the children’s sake.
The prospect of the mother allowing the father to have visitations with his daughter during periods of religious observance has led the mother to believe that if the child sees the father on Sabbath and holidays she will eventually lose her daughter to the father and Joseph as well. The mother also appears to be reacting to her inability to see Joseph on the Sabbath and holidays as a basis to deny the father visitation with the daughter as punishment. The motive though is complicated by not only retribution but a real fear of losing Esther to both her father and brother.
The mother was not credible in her testimony that she was curtailing the father’s visitation time with the daughter because the daughter has suffered headaches after her return from the visits. Nor did she offer any medical testimony to substantiate that claim. Significantly she could not even articulate any visitation schedule that would be acceptable to her. The mother was often evasive in her answers to questions, often giving answers which were not responsive to the question but a continuation of her war with Mr. R, giving no regard to the substance of the question before her. At times the court could not help but recognize that she would make things up as she went along in her testimony.
During the course of this litigation the parties should have had the opportunity to celebrate what has been described as a *391 joyous occasion in the Jewish faith, the Bar Mitzvah of their son (confirmation of a 13-year-old boy). Instead the testimony reveals an event fraught with despair, chaos and utter disrespect for each other and their children. Not only were their disputes as to who was invited and the roles that each of the families would play, the father planned and conducted the event in almost secrecy, inviting the mother and her family only as a matter of last resort. The celebration that followed resulted in an incident revolving around whether it was appropriate for the maternal grandfather to wear a certain hat that should have allegedly been worn by only the father. The result was a knife-wielding incident which almost resulted in a physical altercation during the ceremonial cutting of the bread. The dispute over the Bar Mitzvah continued with litigation in a plenary action regarding the pictures from the happy occasion.
It is also clear that Esther has been placed in an intolerable position. She is denied visitations with her father, especially during periods of the Sabbath and holidays, which she clearly wants to have. She is sent to a school which teaches her a set of religious beliefs at a certain level and she comes home to a mother who has set a different level of observance. There is no doubt in this court’s mind that Joseph actively solicits his sister to rebel against the mother and her level of belief. Clearly the mother has not attempted to reconcile those differences to allow Esther to accept both. Her only goal seems to be to reject anything the father wants without regard for helping Esther to accept that there can be different levels of belief at home and school, and even between brother and sister. Instead, Esther is faced with absolutes — extreme alternatives instead of being taught that there is a way to accept the differences. Significantly, Esther’s Law Guardian argues that her client wants to spend more time with the father and even live with him.
Dr. David, while describing Esther as having mild emotional problems, states “her emotional problems may worsen if her home situation continues to be perceived as minimally supportive and protective.”
Dr. David clearly indicates concerns for the importance of a continuing relationship between Esther and her father. The forensic evaluator is concerned about Esther being left home alone on one occasion, and that the neighbor who watches Esther after school is not providing proper support and nurturing. Esther revealed to the forensic evaluator her concerns about her mother’s activities.
*392 The same best interests standard that is employed in determining custody applies to a visitation dispute. (See also, Matter of Gago v Acevedo, 214 AD2d 565 [2d Dept 1995] [“It is well settled that, in adjudicating custody and visitation rights, the most important factor to be considered is the best interests of the child”]; see also, Allen v Farrow, 197 AD2d 327, 333 [1st Dept 1994]; Daghir v Daghir, 82 AD2d 191, 191-192 [2d Dept 1981] [“As with all cases involving visitation, we must resolve the dispute, not solely out of consideration of the desires and convenience of the parents, but out of concern for the best interests of the children”].) The Court of Appeals held “[v]isitation is a joint right of the noncustodial parent and of the child.” (Weiss v Weiss, 52 NY2d 170, 175 [1981]; see also, Daghir v Daghir, supra, at 193 [wherein the best interests “lie in his being nurtured and guided by both of his natural parents”].) The Court defined exceptional circumstances as those in which visitation would be “inimical to the welfare of the child or where a parent in some manner has forfeited his or her right to such access.” (Supra, at 175.) Absent exceptional circumstances, the noncustodial parent must have reasonable visitation privileges. Any “denial of those rights to a natural parent is a drastic remedy which should only be invoked when there is substantial evidence that visitation would be detrimental to the child.” (Paul G. v Donna G., 175 AD2d 236, 237 [1991].)
The court is aware that Esther wants to live with her father. The more the mother prevents Esther from seeing her father the more she will resent her mother. The court does not have to accept the preference of a child. (See, Spetter v Spetter, 133 AD2d 750 [1987]; Ira K. v Frances K., 115 AD2d 699 [1985].) The court, though, is aware of her desires. This child wants to see her father and it is especially important for her to see her father on the Sabbath and Jewish holidays.
For the parties to enjoy the time they will be spending with their children and for them to have a healthy relationship with their children, the attempts to pollute the children must come to an end. The extremes that all appear to take if continued will only lead to years of fighting, discord and further litigation. The beliefs that the children have been taught in home and school must be the way they are allowed to live their lives. To be inconsistent in that previously agreed-upon lifestyle will lead to greater strife and emotional harm to the children.
Esther has a right to spend time with her father and that time should not be restricted on what all agree is the very important Sabbath and holiday periods in the Jewish faith. In *393 fact, to deny her this opportunity will only serve to further her anger toward her mother and further confuse her. It is important that the father make sure that during these visits that Joseph does not pressure or confuse Esther any further. A parent has an obligation to protect a younger child from an older child during periods of visitation.
Joseph also has an obligation, with his father’s encouragement, to visit with his mother. He is too young and too set in his ways to be allowed to, on his own, decide to write off his mother. The visitation must be undertaken with the mother respecting Joseph’s beliefs and during the time he is with her not interfering with, criticizing or trying to change those beliefs. To deny the mother all contact during the Sabbath and religious holidays with the child would only serve to further alienate them from each other. They should spend time together on “neutral territory” on a regular basis and occasionally in the mother’s home. In adjudging the credibility of the mother, the court cannot ignore that she has no real proposals for visitation. Hopefully, minimizing the contact Joseph has with his mother on Sabbath and holidays will lessen the strife between them and allow them to start rebuilding their relationship. Therefore, the court enters an appropriate visitation schedule for both parents consistent with this opinion.
It is the obligation of both parents to remember that they are the adults, the role models, and it is their obligation to conduct themselves in a manner which respects and honors the beliefs and practices of the visiting child. It must be clear that the custodial parent determines the appropriate level of religious.beliefs consistent with prior intent and practices. The parent receiving visitation must honor that practice during the period of a visitation consistent with the original decision they made regarding custody and religious practices. Both parties and the children are strongly urged to seek family and individual counseling. To continue to fight over what the counselor’s background should be is harmful to the children and counterproductive.
Both children shall be afforded reasonable telephone contact with a parent if they desire same.
[Portions of opinion omitted for purposes of publication.]