OPINION OF THE COURT
Jeffrey S. Sunshine, J.
Petitioner, Ronald F., a convicted felon who is unrelated to the two subject children, has filed for guardianship of these children who presently reside with him and his wife. The respondent, Lawrence G., the maternal uncle and adopted brother of the children, has cross-petitioned for guardianship of the two subject children and opposed the petition of petitioner F.
Based upon the testimony of the witnesses and documentary evidence introduced at the hearing, the court enters the following findings of fact and conclusion of law.
The children, Tsahai G., born September 5, 1985, and Shawana G., born January 6, 1987, have resided with the petitioner whom they refer to as “Daddy Ronald” since March of 1998.
The children’s mother was a persistent drug abuser and both children were removed from her care, at very young ages. The petitioner believed he was the putative father of Shawana but was not considered a resource for the children. The petitioner was incarcerated when the children were removed from their mother’s cáre. The petitioner has a long criminal history. However, during the times when he was not in prison between 1988 and 1997, the petitioner had regular contact with Shawana. Both children were raised by their maternal grandmother and in 1996, both children were legally adopted by her. On the day the petitioner was released from prison in 1997, he went to the maternal grandmother’s home to visit both children. Throughout the remainder of 1997 and beginning in 1998, the petitioner regularly visited with both children on the weekdays and sometimes on the weekends. It appears that although the children were legally adopted by the maternal grandmother, their biological mother was known to them.
In the fall of 1997, the petitioner was told by the maternal grandmother that she was ill. In early 1998, the respondent uncle (who is also the cross petitioner) visited the petitioner at his place of employment and asked him to take care of the two subject children because the maternal grandmother was dying. In March 1998, both children came to live with the petitioner. In April 1998, the maternal grandmother/adopted mother died. On May 21, 1998, the petitioner filed for guardianship of both *762 children. The petitioner believed he was the biological father of Shawana since her birth. It was later determined, during the course of these,, proceedings, that the petitioner is not the biological father of Shawana. However, a temporary order of guardianship was granted to the petitioner on July 7, 1998 and the children have resided with him since that time. It was not until July 15, 1998 that the respondent uncle filed cross petitions for guardianship of both children, his maternal nieces who are by operation of law his adopted sisters.
In a guardianship/custody dispute between two parents, the court is bound to make its determination based solely upon what is in the best interests of the children. The Court of Appeals firmly established a “totality of the circumstances” approach to all custody determinations, indicating that no one factor should be determinative in deciding what is in the best interests of the child. (See, Eschbach v Eschbach, 56 NY2d 167 [1982]; Friederwitzer v Friederwitzer, 55 NY2d 89 [1982].)
Even though this case does not involve two parents, the totality of the circumstances analysis is appropriate herein.
Under the totality of the circumstances rule no one factor is determinative in making an award of custody. Determining what is in the child’s best interest requires that consideration be given to many factors such as: the relative stability of the respective parents, the wishes of a child, the effect of separation of siblings, the length of time the present custody arrangement has continued, the care and affection shown to the child by the parents, the parental guidance the custodial parent provides for the child, the ability of each parent to provide for the child’s emotional and intellectual development, the atmosphere in the homes, the morality of the parents, the financial standing of the parents, the refusal of a parent to permit visitation and/or the willingness of a parent to encourage visitation, and the over-all relative fitness of the parties. The existence or absence of any one factor cannot be determinative since the court must consider the totality of the circumstances. In the end, any determination of child custody must be based upon what is in the best interest of the child and what will best promote his or her welfare and happiness. (See, Young v Young, 212 AD2d 114 [2d Dept 1995]; Eschbach v Eschbach, 56 NY2d 167 [1982], supra; Nehra v Uhlar, 43 NY2d 242 [1977].)
Even in a guardianship proceeding, the same best interest test must apply for the benefit and welfare of these children. Neither party is a parent. Although the respondent is a blood relative, there is no prima facie preference for a blood relative *763 over a person who is not related to the child. (Matter of Jennifer A., 225 AD2d 204 [1st Dept 1996], lv denied 91 NY2d 809 [1998]; Matter of Peter L., 59 NY2d 513 [1983].)
Since neither party is a parent, the court need not apply the two-prong test enunciated by the Court of Appeals in Matter of Bennett v Jeffreys (40 NY2d 543 [1976]), and there is no need for an exceptional circumstances analysis prior to reaching the question of what is in the children’s best interests.
Both parties, the petitioner’s (F.) wife, and the respondent’s (G.) wife testified. The court found the respondent to lack credibility. The respondent’s demeanor was dishonest, circumspect, self-serving and at times arrogant. The court credits the testimony of the petitioner and petitioner’s wife. The evidence has demonstrated the excellent job of parenting the petitioner and his wife have done since the subject children have been in his care since March of 1998. The petitioner has provided a loving, stable environment for both children. The petitioner and his wife have brought stability to the lives of these children in a time of bereavement and emotional turmoil.
On December 3, 1998 blood tests revealed that the petitioner was not the biological father of Shawana even though the petitioner and the child truly believed he was her father. The court directed that neither party was permitted to inform Shawana of the results of the blood tests pending trial. Although the petitioner learned he was not the father of Shawana, he did not consider withdrawing his petition because he loves both children and wants them to live with him regardless of the lack of a blood relationship. The children refer to the petitioner as their father (“Daddy Ronald”) and to the petitioner’s wife as their stepmother.
The evidence shows petitioner has been involved with the respondent’s family for 25 years because he had a periodic relationship with the mother of the children, Camilla G., for 25 years. The G. family assumed that the petitioner was Shawana’s father. Although the natural mother’s rights to these children were terminated years before, she still was involved in their lives. The natural mother, along with others, aided in the care of the subject children when the maternal grandmother/ adopted mother became ill, in October 1997. The respondent uncle went to the petitioner’s place of employment in early 1998 to ask whether the petitioner could care for the subject children because no one else wanted to take care of the children and the respondent was unable to care for them because of his lifestyle. Conveniently and without credibility the re *764 spondent disputes this. Following the death of the natural mother in March 1998, the petitioner and the respondent had a second conversation regarding the children, and both children then came to live with the petitioner and his wife. The respondent was too overwhelmed with his own problems to assume responsibility for his nieces at the time of the maternal grandmother’s death. The respondent did not provide daily supervision of these children. Other friends and relatives were taking the children to school, preparing their meals and attending to their material needs. After the children came to live with the petitioner, the respondent did not provide the petitioner with financial support, clothing or gifts for the children. In September 1998, the petitioner applied for Medicaid for both children and learned that the respondent was receiving and converting Social Security funds for the children in the amount of $1,400 per month, since April 1998. After reporting this situation to this court in February 1999, the court issued an order directing the funds to the petitioner and petitioner began receiving the money for the children. Petitioner testified that he gives the children half of the sums each month for their own spending and saves the remainder in bank accounts for the children. The petitioner informed the court that there is a trust fund in Shawana’s name that was established pursuant to a settlement of a personal injury claim.
After both children came to live with the petitioner and his wife, they moved to a larger apartment so that the children could have more space and each would have her own room. The Administration for Children’s Services (hereinafter ACS) completed an investigation of the petitioner’s home and found it to be a fine environment. The petitioner and his wife selflessly arranged their work schedules to insure that one or the other is always home with the children and to permit maximum personal supervision of them. The petitioner and his wife have both been employed in the same employment working for a fast food establishment for over a two-year period.
The petitioner’s wife testified that she has a loving relationship with both children, that she is emotionally attached to them although no biological relationship exists. Both she and the petitioner regard the children as their children. Both she and the petitioner are equal partners in parenting the children. The evidence has demonstrated that the petitioner and his wife are stable in that they have a good marriage, have decent jobs and that they have a combined income which is modest yet sufficient to support the children. They owe no large debts and are hardworking members of the community.
*765 The petitioner and his wife attended to the children’s medical and dental needs. Aware that both children had problems in school, the petitioner and his wife endeavored to address these problems by closely supervising homework, assigning extra study assignments, providing remedial assistance and speaking to the teachers. The children are even reading newspaper articles daily and writing paragraphs about the articles with petitioner’s supervision.
The petitioner and his wife have nurtured the children emotionally and spiritually. Recognizing that the deaths of their natural mother and maternal grandmother had caused depression and withdrawal in both, the petitioner and his wife asked for professional help and enrolled the children in counseling. The petitioner, his wife and the children worship as a family and the petitioner has involved the children in the social life of the church. The petitioner clearly sets limits for the children, supervises them closely and imposes appropriate consequences when school performance or other behavior falls below acceptable levels.
The petitioner recognizes the importance of maintaining ties between the children and their maternal family. The petitioner and his wife opened their home to maternal relatives and maternal close friends and the petitioner has taken the children to G. family events and to visit maternal relatives. The court is truly impressed by the conduct of petitioner and by the children’s respect and appreciation as evidenced by the in camera interview held by the court. The petitioner’s task will not be an easy one, but as of now he has clearly assumed the responsibility.
On September 15, 1998, the court granted a temporary order of visitation to the respondent uncle with the subject children. Between March 1998 and when the court-ordered visits began, in September, the children did not see the respondent often. The respondent kept approximately six of the court-ordered visits and missed at least that many. The respondent did not call to cancel the visits; the children would telephone him to learn whether he planned to attend and the respondent would not return the calls. The respondent offered no viable explanation for missing the visits with the children except that he did not understand the concept of court-ordered visitation and so he totally ignored it and visited when he pleased. He did though think nothing of collecting the children’s monies.
When the subject children returned from the visits with the respondent they were confused and uncooperative. The chil *766 dren told the petitioner, the Law Guardian and the caseworkers from ACS that the respondent referred to the petitioner and his wife as “ghetto people”, “bitches”, “bastards” and “criminals”. To their great credit, the petitioner and his wife continued to comply with court-ordered visits with the respondent even when they were presented with abundant evidence that the respondent was insulting them with vulgar language, endeavoring to undermine their authority and relationship with the children. The respondent would tell the children that they did not have to obey the petitioner or his wife because they were not “family” and that they did not care about them. Based upon the statements of the Law Guardian, the court-ordered investigation by ACS and the in camera interview of the children, the court suspended the temporary order of visitation to the respondent on March 8, 1999, and the visitation suspension still remains in effect. It should be noted that in open court this court offered to allow the visits to continue if the respondent uncle agreed to stop his behavior. He adamantly refused to agree.
In speaking to the children, the respondent admitted to using such terms as “criminal” and “criminal element” in referring to the petitioner. The respondent told the children that he was opposing the petitioner’s guardianship because the children were supposed to be with their family. The respondent acknowledged that the children had never reported to him any criminal or inappropriate behavior by the petitioner or his wife. The respondent testified emphatically that if the court granted him guardianship, he would not allow the children to visit the petitioner and his wife because he did not believe it would be in their best interest or their safety to be around the petitioner or with his associates. It also became abundantly clear during the trial that the uncle violated the court’s direction and revealed the results of the blood tests to the children.
The petitioner’s criminal record in this case was repeatedly and emphatically addressed by the respondent throughout this hearing. The petitioner was released from prison on parole status in April 1997 and has never violated his parole. The petitioner was first imprisoned in 1981 for possessing a firearm and he served a year for this crime. Between 1983 and 1987 he was arrested several times for pickpocketing. He served one prison term lasting 22 months for pickpocketing and another lasting five years and eight months. The longest sentence he received was 7 to 14 years for robbery. In 1994, he violated work release and was returned to prison. Since April 1997, he *767 has complied with the conditions of parole including maintaining employment, remaining drug, free, supporting his dependents and avoiding trouble with the law. The petitioner did not attempt to deny his record, minimize it or excuse it in any way. The petitioner testified credibly that since his release from prison in April 1997, he has faithfully obeyed all the conditions of his parole. Today, he is a law-abiding, drug-free, gainfully employed citizen who is supporting his wife and the subject children.
The petitioner has observed the conditions of his parole for a continuous period of over two years. All the evidence established that the petitioner has paid his debt to society for his past misdeeds, has renounced his past lifestyle and now is wholly devoted to the responsibilities of his job, his family and the two subject children he regards as his daughters. At this juncture, petitioner is a viable alternative to the uncle and to foster care.
Moreover, there is nothing in this record to suggest that the petitioner has been involved in any criminal activity or unsavory behavior since his release from prison. He has acted appropriately in dealing with both children and there is no indication of an inappropriate behavior towards the children that was abusive, neglectful or even questionable. None of the offenses committed by the petitioner involved crimes against children. Clearly, the petitioner has established his fitness as a parent now. This court is not in any way minimizing the convictions of the petitioner. However, this court believes that the petitioner is at present fit to act as the guardian for the children. This court believes that the petitioner loves the children and that the petitioner has proven that he and his wife can more than adequately care for these children. There is absolutely no evidence in this record which indicates that the petitioner’s past criminal history has had an adverse effect upon the children. The evidence indicates that the children are progressing, are happy, contented and well cared for. On the other hand, the respondent’s past performance as revealed in the record affords little hope that he could provide a warm atmosphere, stability, and the love and security these children now enjoy.
In sharp contrast to the excellent job of parenting the petitioner has done, the respondent rests on his biological and legal relationship as the source for his supposed qualification for guardianship. The respondent never had daily responsibility of the children. The children never lived with him or his *768 wife. Although he vaguely represented that he was involved in their rearing and schooling, the respondent could not name a single teacher or friend of the children. The respondent did not provide the children with food, clothing or shelter from his own pocket.
On the contrary, the respondent jeopardized and squandered the children’s assets and diverted their funds for his own purposes. The respondent’s handling of his nieces’ financial affairs is deplorable and is alone sufficient to disqualify him as an appropriate guardian. The respondent signed his name to adoption subsidy checks received on behalf of the children and kept the money for himself. The respondent collected Social Security funds totaling thousands of dollars on behalf of the children and kept the money for himself. He defrauded the Social Security Administration by failing to reveal that he. was not the children’s guardian and he cheated the petitioner by failing to inform him of his entitlement to those monies. Most reprehensibly, the respondent kept all the money for himself and did not even purchase any necessities or gifts for his nieces. The respondent never told the Social Security Administration that the petitioner was the temporary guardian, nor did he tell the petitioner as temporary guardian that he was collecting Social Security funds for the children. The respondent’s misappropriation of these funds ceased only when this court ordered the funds to go to the petitioner.
In addition, the respondent should have paid the mortgage on the home of his deceased mother where the subject children previously resided. It is clear that the respondent uncle’s interest in the children heightened when he realized that in intestacy the children were partial owners of that home. Although the respondent gave conflicting testimony as to where he actually resided, it was conceded that he had been living in that home a good deal of the time since his mother’s death. The respondent was allegedly paying the mortgage on this home and renovating it, in anticipation of the arrival of his wife, his own children and these subject children. The testimony revealed that no real renovation had occurred in the home, but that the respondent had spent approximately $1,000 of the subject children’s money to purchase new furniture. The respondent had not made a single mortgage payment on the home where the subject children had lived for many years and now foreclosure proceedings are pending. He collected the children’s money and allowed their home, which they have a beneficial interest in, to lapse into foreclosure. No probate or *769 administration proceedings were instituted. The respondent made no serious effort to prepare the house for their return.
Neither Mr. G. nor his wife ever provided the children with medical or dental care, counseling or assistance for their school problems. While the petitioner was well attuned to the effects of bereavement upon both children, the respondent could only relate to the deaths of his sister and his mother in terms of his own losses. Throughout the hearing the respondent relied upon his paralysis caused by his own grief but not once did he acknowledge the incalculable losses suffered by his nieces nor did he show an appreciation for their need for comfort and reassurance. Consumed by his own interests, the respondent saw the children infrequently before the period when court-ordered visits began. The respondent admitted not seeing them at all between May and July 1998. It was only after petitioner filed for guardianship did he himself seek guardianship. He admitted to the court that had petitioner not filed, he would have not filed.
The respondent failed miserably in attempting to portray his arrangement to send the children to the petitioner’s home as a temporary solution made with great reluctance. The respondent testified that it was never his intention for the children to permanently reside with the petitioner. It was his position that during a very difficult time in the respondent’s life, he requested the assistance of the petitioner to help him care for his nieces. Although the respondent knew of the petitioner’s criminal record, the respondent believed that he would be able to oversee the petitioner’s care of the children until the children’s home was ready for their return. It is obvious to this court that, in fact, the respondent had no qualms about the quality of care the petitioner could provide. That the decision of the respondent was meant to be long term rather than temporary is confirmed by the fact that no date or circumstance was established for the return of the children to the respondent. By his own admission, the respondent did not monitor or supervise the children’s adjustment to the petitioner’s home, nor did he visit them. If the respondent truly had genuine concerns that the children would be exposed to criminal elements in the petitioner’s home, then sending them there under any circumstances would have been irresponsible and would raise serious questions about the respondent’s judgment. Moreover, the respondent did not ready the children’s home for their return and the house will soon be lost to foreclosure.
Taking the testimony and documentary evidence as a whole, the respondent’s, principal motivation for the filing of the *770 guardianship petitions is obvious: he wanted control of his nieces’ money once he understood the children’s intestate rights to the home.
The respondent argues that he is the fit and stable guardian for the children based on the fact that he is a good role model with good morals and values and a strong work ethic because he has been gainfully employed all of his adult life; that he works as a bus driver for the Transit Authority; that he has no criminal history; and that he has a loving home surrounded by family members. The evidence shows this in fact is not the case.
The respondent had a well-paying job as a bus driver but he had been suspended several times for causing an accident and for serious passenger complaints. These suspensions lasted as long as a month at a time. The respondent’s marriage is certainly not intact. The court doubts seriously his allegation that he is living in his deceased mother’s home for purposes of preparing the home for his wife, children and nieces. The respondent lived with another woman for a period of six months during 1998 unbeknownst to his wife. The respondent made false representations to his wife, the court, to ACS and to the Social Security Administration as to his residence. The respondent noted a false address on his petitions for guardianship. The respondent is now paying child support for his own children, pursuant to court order; therefore, he is not living with his wife and children, as he so states. The respondent and his wife have not lived together on a daily basis for at least 14 months as of June 1999. Thus, the respondent’s ability to provide a stable living environment for his nieces is doubtful. His “concocted” story of his intentions is nothing more than a sham.
The respondent’s wife testified that she supported her husband’s guardianship petitions for his nieces and that she would assist in the care of the children whom she has known all their lives. Curiously, the respondent’s wife never lived with these children or cared for them on a daily basis. She had not put herself forward at any earlier time as a resource for them. The respondent’s wife maintained that the home (that is in foreclosure) was ready for the children, but not for her and her children. Notably, neither the respondent nor his wife ever suggested that the children could live in their marital home in the Bronx where the respondent’s wife lived and her husband allegedly visited on the weekends.
The respondent’s lack of true concern for the subject children is demonstrated by his behavior with respect to visitation. The *771 respondent never maintained a regular visitation schedule from the time the children went to live with the petitioner. The respondent did not frequently exercise his right to court-ordered visitation and when he did visit, he did not use the opportunity to nurture and maintain his relationship with his nieces and promote their welfare. Instead, he spent his time disparaging the petitioner and his wife and attempted to poison the relationship between the children and the petitioner and his wife. Without regard for the emotional effect upon the children who had already experienced great emotional pain, the respondent attempted to generate guilty feelings for deserting their family and displaying affection for the petitioner and his wife. The respondent was unwilling to forego his smear campaign even though it meant losing his court-ordered visitation. The respondent’s declaration that he would not allow the children to have contact with the petitioner if he were awarded guardianship demonstrates that the respondent’s principal motivation is revenge and financial gain, not the stability and emotional well-being of the subject children.
This court has given great weight to the position of the Law Guardian, who has unequivocally stated that the guardianship of the children be given to the petitioner.
Based upon the foregoing, the petitioner is hereby granted final orders of guardianship of both children. This court finds that the children are well cared for, physically and emotionally, and that the continued healthy development requires a stable and secure environment which the petitioner can and does provide.
The petitioner has been the only stable influence in these children’s lives since the death of their grandmother. They are both happy with the petitioner and both want to remain in his care. The children have developed a strong, loving relationship with the petitioner. They have lived with the petitioner since March 1998, and this court will not make any further changes in their lives. This court will not do to these children that which has been done to them before, by circumstances beyond all of our control, and that is to take their parent away again. This court finds that the respondent cannot provide a stable and secure environment and cannot and will not act in their best interest. The respondent’s attitude would substantially interfere with his ability to place the needs of the children before his own. Therefore, the cross petitions for guardianship filed by the respondent are hereby dismissed. Once the respondent agrees to stop his campaign to discredit petitioner, the *772 court would consider the resumption of visitation with the children.
The guardians are directed to immediately take steps to protect the financial affairs of the children.