■ J.C.D., Appellant, v D.W.D., Respondent. [676 NYS2d 100] —Order and judgment (one paper), Supreme Court, New York County (Walter Tolub, J.), entered July 18, 1997, which, after trial and to the extent appealed from as limited by plaintiff's brief, granted defendant custody of the parties' two children, affirmed, without costs, for the reasons stated in the decision by Justice Tolub.

In view of the dissent's adoption of plaintiff's version of events in virtually all respects, we wish to add the following. While the question of custody may have been a close one in this case, it was the Trial Judge who had the opportunity to observe the witnesses and evaluate their credibility, and, notwithstanding the seriousness of the allegations involved, the court concluded that defendant had not been maliciously motivated in voicing and acting on her suspicions. Having

heard all the experts agree that *both* parents were fit, the trial court came to the difficult conclusion that the best interests of the two young children of this marriage would be served by remaining with the mother, who had always been their primary caretaker and would be able to spend more time with them than plaintiff. In this respect, the court's decision does not reflect a preference for or misguided belief in the superiority of maternal, rather than paternal, care of young children; rather, as the opinion states, it is the availability of "more intimate contact," not the gender, of the custodial parent that persuaded the court to leave the children with their mother. In addition, in prescribing numerous specific conditions as part of the custody award, the court endeavored to fashion an arrangement with sufficient safeguards to protect plaintiff's rights and, most significantly, the best interests of the children. We are confident that the court will be vigilant in ensuring their enforcement. Concur—Milonas, J. P., Rosenberger and Mazzarelli, JJ.

Wallach and Williams, JJ., dissent in a memorandum by Wallach, J., as follows: We would reverse the order and judgment appealed from to the extent that it granted custody of the two children of the parties to the defendant mother, and grant primary custody to the plaintiff father, with the liberal visitation provisions therein to be applied in favor of defendant, and with leave to either party to apply to the trial court for resettlement of the visitation provisions should the need arise.

Because the majority has chosen to affirm "for the reasons stated" in the trial court's nine-page memorandum, we are obligated to analyze the reasoning applied at nisi prius with closer attention than is normally required. In its opening paragraph, the trial court (properly, in our view) defined "the ultimate issue" in this difficult case as "whether the defendant-mother by word or deed wrongfully accused or made it appear that the plaintiff-father had sexually molested their three-year old daughter and physically abused their 1½ year-old son."

Based on its own express findings set forth in the course of its opinion, it would appear that the court was ineluctably led to a clear-cut "Yes" answer to the query posed. The court found:

(1) Two days after signing a contract in late April 1995 to purchase a cooperative apartment, plaintiff arrived home "and found his wife and children missing."

(2) Defendant had surreptitiously removed the children to her family home in New Hampshire.

(3) Defendant prevented visitation by plaintiff for three weeks. During this interval, she arranged four visits with the

sexual abuse unit at Boston Children's Hospital to "investigate" whether her infant daughter had been sexually abused.

(4) When plaintiff was finally permitted to visit his children in New Hampshire on the weekend of May 19, "the children were not at home, but the sheriff was and the plaintiff was served with a 'Libel for Divorce.'"

(5) "In the course of the past two years, notwithstanding Mrs. D's protestations to the contrary, she has overtly and covertly maintained that Mr. D molested their children. *She has denied Mr. D visitation wherever and whenever possible.*" (Emphasis supplied.)

(6) In the summer of 1995, "the parties and their daughter underwent extensive examination by a battery of Court appointed specialists." Neither the specialists nor the child's pediatrician found any evidence of abuse.

(7) Defendant's allegations of sexual abuse were totally unfounded.

(8) The following February, "just when it appeared that relations might normalize and the specter of child molestation fade, Mrs. D produced a tape recording purporting by its transcript to buttress the charges of child abuse."

(9) The court-appointed psychiatric expert concluded that there was no basis for these latest contrived allegations. In fact, it became clear upon cross-examination at trial that defendant had "coaxed, pressured and manipulated her daughter to make the suggestive statements" on the tape recording.

After making these findings of fact and others seriously damaging to defendant's position, the trial court proceeded, *sub silentio*, to abandon the earlier-announced "ultimate issue," which somehow vanished into thin air. It then reached three untenable conclusions, resulting in a custody award to defendant:

(1) Although defendant tried to isolate her children from plaintiff, "at no time did she demean Mr. D's personality or character to her children."

(2) Defendant "genuinely believes" that plaintiff molested her daughter, and "only when confronted with the lack of independent evidence to substantiate these terrible allegations" did she "capitulate to the expert's conclusion" that there was nothing to substantiate them.

(3) Despite her past behavior, defendant has "begun to accept that she may have been mistaken and that through continued therapy, this issue may be resolved."

These conclusions are either immaterial, irreconcilable with

the preceding findings of the court, or clearly in conflict with the weight of the evidence in the record.* First of all, it is nothing more than wishful thinking to suppose that "at no time" did this mother "demean Mr. D's personality or character to her children." It would be hard to imagine anything more destructive or "demeaning" to a father than to "coach, pressure and manipulate" a three-year old girl into making accusations of sexual abuse on a tape recording. Even more telling is the fact that the mother herself produced this tape (an insidiously edited version, to be sure) and submitted it as a triumph of vigilant parenting. And in the endless round of examinations, interviews and tests arranged by the mother for these remarkably healthy and resilient children, is one to assume that she explained these invasions of the children's lives as a search for the cause of the common cold? Some common sense must be applied here.

Second, the "genuineness" of the mother's belief is immaterial. An obsession or a delusion may be held with the utmost tenacity, but that does not make it "genuine" in any meaningful sense. That defendant did not capitulate to the experts' determinations of no child abuse is evidenced by her reaction to those reports. After one doctor's exoneration of plaintiff with respect to the three-year old daughter, defendant then raised the specter of abuse of the infant son—first physical, and then sexual. And where no evidence existed, this defendant was prepared to manufacture it. In short, defendant's unrelenting campaign transgressed the actions of any reasonable person, which should be the simple test applied here.

Finally, the idea that defendant "has begun to accept that she may have been mistaken" is based upon unwarranted optimism and is belied by the record. The most recent psychiatrist appointed by the court reported that in his interview with defendant, she continues to express doubts that her children are "safe" with their father. The court accepted Dr. Stephen Herman's findings that defendant's personality showed histrionic and narcissistic features, and that her thinking was superficial, unreflective and stereotyped. What the court was unable to accept was Dr. Herman's ultimate recommendation

---

* We are chided by the majority for our alleged "adoption of plaintiff's version of events in virtually all respects." This observation is extremely wide of the mark. It should be clear from our discussion that we rest our analysis entirely upon (i) the actual findings of the trial court, (ii) the report of the neutral court-appointed psychiatrist, (iii) the undisputed medical evidence, and (iv) the admissions and recantations expressed by defendant herself in her sworn testimony. We do not mention, nor do we place the slightest reliance upon, plaintiff's "version" of anything.

that the best interests of these children would be served by vesting primary custody in their father. While a court is not bound slavishly to accept the recommendation of a neutral expert (*Chait v Chait*, 215 AD2d 238, 239), an explanation for that rejection should appear. No acceptable basis is provided here.

The trial court candidly conceded that "[w]ere these children older, my conclusion might not be the same. There is no substitute for direct parental involvement in these tender years." Essentially, the court made its ultimate ruling not with reference to its findings on the record, but on a resurrection of the now repudiated "tender years" doctrine—that a presumption in favor of the mother arises from the greater nurture that a parent with less employment demands can provide.

New York courts have long rejected the notion that there is any presumption in favor of awarding custody of young children to their mother (*Matter of Barkley v Barkley*, 60 AD2d 954, 955, *affd* 45 NY2d 936; *Matter of Vincent v Vincent*, 47 AD2d 786, *appeal dismissed* 37 NY2d 774; *Matter of Toni "FF" v James "FF"*, 37 AD2d 893, 894). Neither parent has a prima facie right to custody; the best interest of the child is the sole consideration for the court (Domestic Relations Law § 70). Despite its lengthy social and legal history here and in other jurisdictions, the role of gender in making child-custody determinations finds no place in our current law (*Linda R. v Richard E.*, 162 AD2d 48).

Considerable authority supports the proposition that a parent's active interference with the relationship between the children and the other parent is "an act so inconsistent with the best interests of the child[ ] as to, per se, raise a strong probability that the [offending party] is unfit to act as custodial parent" (*Entwistle v Entwistle*, 61 AD2d 380, 384-385, *appeal dismissed* 44 NY2d 851), especially where such interference takes the form of unfounded allegations of child abuse, and coaching of the child to make such false allegations (*Matter of Gago v Acevedo*, 214 AD2d 565, *lv denied* 86 NY2d 706). The case at bar provides a paradigm for the application of this legal principle (*Young v Young*, 212 AD2d 114; *see also, Matter of Rebecca B.*, 204 AD2d 57, *lv denied* 84 NY2d 808).

The best interests of these children is the controlling factor, and in addressing that concern, our discretion is as broad as the trial court's (*Matter of Louise E. S. v W. Stephen S.*, 64 NY2d 946, 947). We conclude that the best interests of these children would be served by substituting their father as the custodial parent.