Matter of H.S. v P.S. (2026 NY Slip Op 50252(U))

[*1]

Matter of H.S. v P.S.

2026 NY Slip Op 50252(U)

Decided on February 13, 2026

Family Court, Kings County

Menon, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on February 13, 2026
Family Court, Kings County

In the Matter of Article 6 Custody/Visitation Proceeding H.S., Petitioner,

againstP.S., Respondent,

Docket No. V-02629-17/23B

Petitioner H.S., pro se.Mina Walner, Esq., New York Legal Assistance Group, 7 Hanover Sq., Floor 18, New York, NY 10004 for Respondent P.S.Mara Wishingrad, Esq., Children's Law Center, 44 Court St., Floor 11, Brooklyn, NY 11201 for child Y.S.

Nisha Menon, J.

Procedural History and Factual Background
On October 18, 2018, this Court entered a Final Order on Petition for Custody and Visitation on Default, which granted sole legal and physical custody of the parties' two children, Y.S. (DOB 2010) and A.S. (DOB 2008), to their mother, P.S. This Order also granted alternate weekend visitation of the two children to their father, H.S. 
On October 17, 2023, H.S. filed the instant Petition for Modification of Order of [*2]Custody, seeking a change of the custody arrangement with regard to the child Y.S. only.[FN1]
In his petition, H.S. alleged that since the 2018 Final Order there had been a change in circumstances in that "Y.S. age 13 y/o decided and actually moved all belongings to father, verbally expresses he is 'uncomfortable' living with mother, refuses to live with mother and wants to live with father and that father should have full custody in the best interest of the child's physical and emotional well being," and requested "full legal and physical custody" of Y. 
Trial on this matter commenced on November 13, 2024, and then continued on April 9, 2025; April 21, 2025; July 30, 2025; August 13, 2025; and December 1, 2025. The Court conducted an in-camera interview of Y on January 14, 2026. 
The parties were the only witnesses. Despite their obvious areas of disagreement and the palpable hostility displayed by H.S. toward P.S., the following facts are undisputed. The parties were married in February 2008. Their first child, A, was born in November 2008, and Y was born in August 2010. The parties separated in 2016, P.S. obtained a final order of sole custody of both children on default in 2018, and the parties' divorce was finalized in December 2023.[FN2]
From the parties' separation in 2016 until "September or October"[FN3]
of 2023, both children resided with P.S. P.S. eventually remarried and became pregnant with a daughter. In September or October of 2023 P.S. informed Y that she was pregnant, and shortly thereafter Y began to spend the majority of his nights at H.S.'s home. Y's brother A, has continued to reside with P.S. since the parents separated in 2016. At this time, also residing with P.S. are her husband and her daughter, who is the half-sister of A and Y.
The parties offered conflicting explanations and characterizations about their experiences with Y and with one another. P.S. testified about how her marriage to H.S. was defined by his violence and control. H.S. instead was fixated on what he considered her "dishonesty"[FN4]
during the marriage. The sharply contrasting testimony, along with other evidence elicited at trial, is representative of a defense mechanism first coined by Jennifer J. Freyd, Ph.D, Professor of [*3]Psychology at the University of Oregon, known as DARVO. This acronym stands for Deny, Attack, Reverse Victim and Offender and is as a three-part strategy of manipulation used "in order to silence victims and escape culpability."[FN5]
When confronted with his behavior, H.S. would deny that it ever took place, instead would attack P.S., and would ultimately attempt to reverse the situation to paint her as the offender and himself as the victim. P.S. testified that starting in 2021 she would no longer communicate with H.S. by phone call or text message, and instead only would email him, due to alleged threats and inappropriate responses. The evidence before the Court, including both parties' respective testimony, shows that this problematic dynamic pervaded the parties' relationship, and remains unchanged even now, nearly 10 years after the parties' separation.
While H.S. testified that Y has been effectively residing with him full time since September or October 2023, P.S. in contrast testified that as a teenager Y has been fluid in how much time he spends at each respective parent's home and considered that he was essentially residing in both parents' homes. Both parties offered into evidence copies of emails exchanged between them, but each had a very different views of the appropriateness (or lack thereof) and motives of their respective messages. Each party likewise offered contrasting views on issues of how financial support of Y were handled and communicated among them, including regarding his education and enrollment in a private school. The parties also offered conflicting testimony and rationales on a variety of other issues, including discussing family court litigation with Y, international travel, medical coverage, and each other's parental fitness. 
Having had the unique opportunity to observe the demeanor and testimony of the parties, and to assess their respective credibility, the Court generally credits the testimony of P.S. over that of H.S. P.S. consistently presented as reasonable and believable in her explanation of events and her thought process, and her responses to the points of contention during examination by H.S.[FN6]
comported with her testimony about how she conducted herself during prior points of dispute between them, and was also consistent with her tone in email messages submitted into evidence. In contrast, the Court finds the testimony of H.S. to have been incredible, self-serving, and incongruent with his alleged rationales for his behavior. Notably, H.S., who opted to represent himself in these proceedings, used his cross examination of P.S. as a mechanism to continue to berate her, requiring the Court and P.S.'s attorney to intervene throughout the trial.
Legal Standard and AnalysisIt is well established that a party seeking to modify a prior order of custody or visitation must establish the existence of change in circumstances between the date of the prior order and [*4]the filing date of the petition. Here, it is undisputed that since the underlying order was entered in 2018, until the fall of 2023, Y resided primarily with his mother. In the fall of 2023 Y began spending the vast majority of his time at the home of his father and that, at this present time, he generally spends time at the home of this mother on some weekends and during holidays. But this change of circumstances is only part of what the petitioner had the burden to establish at trial. The relevant and necessary legal questions before this Court also include if changing legal and/or physical custody is warranted to protect Y's best interests. See e.g. Maynard v Maynard, 138 AD3d 794, 795 [2d Dept 2016]; Franco v Franco, 127 AD3d 810, 810 [2d Dept 2015]; Holmes v Holmes, 116 AD3d 955, 955 [2d Dept 2014]; Sidorowicz v Sidorowicz, 101 AD3d 737, 738 [2d Dept 2012]; Guerra v Balistreri, 49 AD3d 646, 646 [2d Dept 2008] (emphasis added). For the foregoing reasons, the Court concludes that while there has been a change in circumstances, H.S. has failed to demonstrate that a change in custody would be in Y's best interest.
In evaluating whether a modification of an order is in the best interests of a child "[t]he test for this court is not whether the parents have changed circumstances, but whether a parent's fitness has changed or the children's lives have been or would be changed." Schoenl v Schoenl, 62 Misc 3d 567, 572 [Sup Ct 2018] (emphasis added). When evaluating each parent's parental fitness, both as it was at the time of the prior 2018 Order and now, it is clear that both parties' respective parental fitness remain fundamentally unchanged.
The record before this Court gives many reasons to be seriously concerned regarding H.S.'s parental fitness. Consistent with P.S.'s testimony, in evidence are numerous emails that plainly demonstrate how H.S. has consistently treated her. In response to an email from Ms. S regarding school registration and payment, H.S. responded "YOU ARE A TERRIBLE ABUSIVE PIECE OF TRASH! YOU DO NOTHING GOOD IN YOUR LIFE YOU ARE A LOW LIFE. YOU TOOK ADVANTAGE OF A FOSTER CHILD WHO TRULY HAS NO ONE IN THIS WORLD! PLEASE DROP DEAD! I now know why you have such an ugly nose with terrible nostrils that you can see the inside of your ugly nose. It is because it resembles your ugly character and your lying tendencies. JUST LIKE PINOCCHIO! YOU ARE A LIAR AND A THEIF TOO."[FN7]
While the Court understands that in emotionally charged circumstances a parent may make statements or act in a manner they later contend is not a true reflection of their normal disposition, that is clearly not the case here. On cross examination H.S. was asked about his comment to P.S. that she has an ugly nose and he began to smile. When asked why he was smiling, H.S. explained that it was because "I think it's true [that she has an ugly nose]."[FN8]
Even weeks after those email statements, H.S. still felt it appropriate to email P.S. again asking "Do you want me to pay for your beauty supplies too (not that it would help)? You got pretty old and ugly last I saw you."[FN9]
The nature, volume, and consistency these [*5]statements, as well as H.S.'s demeanor during cross examination when asked directly about these statements, only bolster the conclusion that they are accurately reflective of his true and persistent nature.
While such comments criticizing P.S.'s appearance are clearly in poor taste and inappropriate, they are most relevant in the context of this custody dispute because they are reflective of why it is extremely unlikely that H.S., if granted custody, would facilitate a meaningful relationship between Y and his mother. No matter the context of the conversation, H.S. seems incapable of not changing subjects to personal smears and threats. In response to a November 3, 2024 email from P.S. asking about the medical care Y received for a knee injury, H.S. replied with a long-winded set of irrelevant insults and threats. "I will be seeking damages of at least Two million dollars [sic] from each of you," "I will be hiring protesters to protest you," "I will cause your life, your mother's life, and your father's life a living hell [sic]," "You better . . . give over custody to me or you will have serious issues for a long time. I promise. You will not like what is coming your way."[FN10]
Quite notably, despite being presented with numerous examples of H.S. acting in such a way, the Court was never presented with any evidence that P.S. ever responded to such vitriol in an inappropriate manner. 
Arguably the most important element of co-parenting is encouraging a healthy relationship between the child and the other parent. With regard to Y's visitation with his father between 2016 and 2023, H.S. alleged that P.S. "would barely ever bring" Y to see him and that H.S. "had to put up a major fight" to have parenting time.[FN11]
In contrast, P.S. testified that when Y was younger she would ensure that he regularly visited his father, but that as he became older at times he "might want space from one parent,"[FN12]
but that if he was resistant to visiting his father she would encourage Y to work through what made him reluctant to visit. In sharp contrast, H.S. not only failed to provide any evidence that he has made any effort to encourage Y to see his mother, but H.S. has only provided this Court every reason to reasonably believe he has and would actively discourage it. 
Even when asked a simple question on direct exam by opposing counsel — "if [you were to be granted] custody of Y, do you believe it's important to co-parent Y with P.S.?"[FN13]
— H.S. was incapable of giving any true indication that he would co-parent. Instead, H.S. went to great lengths to avoid giving a straight answer and extensively qualified any response. H.S. essentially rejected the premise of the question and argued that "co-parenting" is "a very loaded [*6]word,"[FN14]
and insisted that counsel needed "to define what co-parenting is."[FN15]
Rather than explain what he would do to co-parent, H.S. also focused extensively on deflecting from himself and instead attacked P.S. He argued that "she wants to be extremely stubborn . . . I have to work with unfortunately what I have"[FN16]
and "I have to protect myself and keep boundaries for myself because I know that she's going to take advantage of everything that she can with me."[FN17]
Tellingly, H.S.'s evasive responses to questions about co-parenting did not reflect any focus on Y and what would be in his best interest, but instead clearly demonstrated H.S.'s fixation on his own intensely negative feelings about P.S. The responses further exemplify his use of the DARVO strategy by denying that he did anything wrong, instead attacking P.S., and trying to reverse the situation to portray her as the perpetrator and himself as the victim. 
One common theme of H.S.'s argument was that P.S. threatened to not pay tuition for Y's schooling. However, the evidence before the Court is that even though Y has been residing the majority of the time with H.S., P.S. always paid and has continued to pay for his school tuition.[FN18]
H.S. also took issue with P.S. involving the police between them once, but P.S. credibly explained her reasons for concern at that time, including statements she reported H.S. made in 2019 that he "claimed to be suicidal and repeatedly texted [her] that [H.S.] want[ed] to kill [himself] and that he [didn't] want the boys in [his] life,"[FN19]
and there was no evidence of any pattern of police involvement outside of that one incident. Additionally, on cross examination H.S. repeatedly attacked P.S.'s characterization that Y was residing fluently between both homes, but the Court finds her reluctance to state that Y was primarily residing with H.S. was an understandable defense mechanism reactive to H.S.'s pattern of attacks and reflective of the fluidity of Y's choices about in which home to spend his time rather than any at attempt to mislead the Court. 
Counsel for Y supported H.S.'s request for an order of custody, emphasized that he is a teenager, and contended essentially that the order should be modified to reflect that he has spent the majority of his recent nights staying at H.S.'s home. This Court is keenly aware that the express wishes of a child of sufficient age and discretion as to custody are a factor to be considered by this Court. Bullotta v Bullotta, 43 AD2d 847, 847 [2d Dept 1974]. However, the express wishes of a child, even a teenage child, are not binding or automatically determinative. It is also essential to distinguish between a teenager's preference for a parent from a teenager's outright refusal to have a relationship with a parent. There was no indication on the record [*7]before the Court that Y had any vehement opposition to having a relationship with his mother, nor was there any evidence that the mother-son relationship was problematic during the seven years he primarily resided with her post the parties' 2016 separation and prior to the instant litigation. It is also notable that P.S. has demonstrated her respect for Y's feelings and decision making in this area, including that has not taken any effort to enforce the ordered residential custody arrangement against Y's will, such as filing an enforcement petition or repeatedly involving law enforcement. Moreover, Y has not suffered any harm during the time when he has chosen to spend more time with his father than his mother. He continues to be included on family travel with P.S. She continues to pay for his tuition and provide him with health insurance, placing Y's needs over her desire to return to the custodial arrangement in the underlying order.
The Court must weight Y's stated preference against a careful determination of what is in Y's best interest and his relationship with both of his parents. H.S.'s disdain for P.S. was so consistent and pervasive that this Court can only reasonably conclude that it has had and would have a strong impact — both direct and indirect — on Y's time with his mother. "'Willful interference with a noncustodial parent's right to visitation is so inconsistent with the best interests of the children as to, per se, raise a strong probability that the offending party is unfit to act as a custodial parent'" Matter of Williams v Norfleet, 140 AD3d 1078, 1079 [2d Dept 2016], quoting Matter of Ruiz v. Sciallo, 127 AD3d 1205, 1206 [2d Dept 2015], quoting Matter of Joosten v. Joosten, 282 AD2d 748, 748 [2d Dept 2001]. If H.S. were to be granted full custody, there is a serious risk that he would not meaningfully facilitate P.S.'s parenting time with Y or her involvement in decision making. 
H.S.'s anger and hostility toward P.S. renders him less fit as the custodial parent, since his attitude "would substantially interfere with [his] ability to place the needs of the children before [his] own in fostering a continued relationship with the noncustodial parent." Janecka v Franklin, 150 AD2d 755, 756 [2d Dept 1989], citing Lohmiller v. Lohmiller, 140 AD2d 497, [2d Dept 1988]. "'One of the primary responsibilities of a custodial parent is to assure meaningful contact between the children and the other parent' and the willingness of a parent to assure such meaningful contact between the children and the other parent is a factor to be considered in making a custody determination." Young v. Young, 212 AD2d 114, 122-123 [2d Dept 1995], quoting Raybin v. Rabin, 205 AD2d 918, 92 [3d Dept 1994], citing O'Connor v. O'Connor, 146 AD2d 909, 910 [3d Dept 1989], Lohmiller at 798. 
H.S.'s treatment of P.S., including as evidenced by his own testimony and the emails offered into evidence, raises great concern to this Court as it is a hallmark symbol of a parent intending to use coercive control to alienate a child from the other parent. Pursuant to Domestic Relations Law §240, this Court must consider the effects of domestic violence upon the best interest of Y. H.S.'s threats and attempts to undermine P.S. as parent are properly considered as a form of domestic violence. "For over 15 years, scholars have understood that domestic violence is not limited to acts of overt physical aggression but rather can exist through the interpersonal relationship dynamics of two adults. One partner may exert coercion over the other, using 'force or threats to compel or dispel a particular response.' Evan Stark, Coercive Control: How Men Entrap Women in Personal Life 228 (2007). Independently, a relationship [*8]may feature one partner controlling the other, through 'structural forms of deprivation, exploitation, and command that compel obedience indirectly.' Id. at 229. Coercion and control can exist together, creating a 'condition of unfreedom' also known as entrapment. Id. at 205." Matter of Aisha R., 79 Misc 3d 1106, 1109-10 [Fam Ct 2023]. Even if P.S. has maintained her composure in the face of H.S.'s efforts at coercive control, the damaging effects on Y, and the concerns regarding H.S.'s parental unfitness, still remain. 
H.S.'s behavior not only has a detrimental impact on P.S., who is currently Y's primary caregiver, it also directly places Y at risk, even as a teenager. "Research has shown that children are not only witnesses to domestic violence, but actual victims who experience the same dynamics in the home." Aisha R. at 1113 (citing Emma Katz, Beyond the Physical Incident Model: How Children Living with Domestic Violence are Harmed By and Resist Regimes of Coercive Control," 25 Child Abuse Rev. 46, 52 (2016). Children exposed to domestic violence have been found to have similar levels of emotional and behavioral problems, trauma symptoms, and compromised social and academic development similar to those of children who are direct victims of the abuse. Samantha Jeffries, In the Best Interests of the Abuser: Coercive Control, Child Custody Proceedings and the "Expert" Assessments That Guide Judicial Determinations, 5 LAWS 1, 2-3 (2016). 
The impact is not limited to children who witness physical violence. "As one court quoted an expert, '[the domestic violence] isn't necessarily physical but may be more dangerous because it's emotional and much harder to detect.'" Lisa Tucker, Domestic Violence as a Factor in Child Custody Determinations: Considering Coercive Control, 90 Fordham L. Rev. 2673, 2677 (quoting G.I. v J.S., CK16-03072, 2017 WL 4792366, at *4 [Del Fam Ct May 18, 2017]). The effect can be serious and long term. "Children who witness domestic violence can suffer serious emotional symptoms including internalizing symptoms (e.g., anxiety, depression, fear, shame, social withdrawal, somatic complaints, bedwetting, poor concentration) and externalizing symptoms (e.g., aggression, impulsivity, bullying, criminal behaviors)." Debra Pogrund Stark et. al., Properly Accounting for Domestic Violence in Child Custody Cases: An Evidence-Based Analysis and Reform, 26 Mich J Gender & L 1, 22 [2019]. And the physical separation of the parents does not mean the end of risk of harm, as "post-separation, perpetrators/fathers can continue to target coercive control at children as well as at their ex-partners. . . . Like adult victims/survivors, many of the children and young people were living under conditions of constraint and entrapment, and coercive control could severely harm their emotional/psychological, social and physical wellbeing and their educational achievement." Emma Katz, Anna Nikupeteri & Merja Laitinen, When Coercive Control Continues to Harm Children: Post-Separation Fathering, Stalking and Domestic Violence, 29 Child Abuse Rev. 310, 322 (2020) (internal citation omitted). 
ConclusionConsidering all of the law and evidence, the Court must reiterate that a modification of the 2018 Final Order of Custody would not be in Y's best interest. It is not in Y's best interest to be in an environment where he would not be allowed to freely love and appreciate both of his parents, nor should he be placed at risk of the long-lasting psychological impacts that can arise [*9]from such an environment. He should primarily reside in an environment free from manipulation, sabotage, or conditioning meant to inspire hatred. The Court has sufficient evidence and testimony on the record before it to have serious concerns about H.S.'s ability to foster a healthy relationship between Y and his mother and finds H.S.'s claims that he has and would support their relationship to not be credible. Conversely, the evidence and testimony has not given the Court any reason to have any serious concerns about P.S.'s ability and willingness to encourage Y's relationship with both of his parents. H.S.'s inability to control his inappropriate behavior toward P.S. clearly presents a serious risk to Y's emotional and psychological well-being. In effect, to grant H.S. his requested relief would be contrary to Y's bests interests.
Decision and OrderAccordingly, for the reasons set forth above, it is hereby ORDERED that the Petition for Modification of an Order of Custody is hereby DENIED WITH PREJUDICE.
Dated: February 13, 2026ENTER:Hon. Nisha Menon

Footnotes

Footnote 1:The instant petition was also erroneously initially docketed as to include the child A as well under V-02628-17/23B, however this was a clerical error and the petitioner H.S. withdrew the erroneous docket with regard to A which was dismissed without prejudice at the first appearance on this matter on November 16, 2023.

Footnote 2:The parties' Judgement of Divorce, entered as Petitioner's Exhibit 4, includes the provision that the October 18, 2018 Order of Kings County Family Court regarding custody and visitation "shall continue."

Footnote 3:Tr 4/9/25 at 45, line 14; both parties referred to this period as "September or October" at multiple times throughout their testimony.

Footnote 4:Tr 8/13/25 at 17, lines 20-22; "And ultimately, I realized afterwards that I was basically dealing with someone who just was not being honest with me;" Tr 12/1/25 at 19, lines 22-23 "P.S., who is extremely stubborn, who lies to me about everything."

Footnote 5:Harsey, Sarah J.; Zurbriggen, Eillen L; & Freyd, Jennifer J.; Perpetrator Responses to Victim Confrontation: DARVO and Victim Self-Blame, Journal of Aggression, Maltreatment & Trauma, 26:6, at 645 [2017].

Footnote 6:As a litigant who choose to proceed pro se, H.S. directly questioned P.S. during this fact finding.

Footnote 7:Respondent's Exhibit A

Footnote 8:Tr 8/13/25 at 37, line 13

Footnote 9:Respondent's Exhibit B

Footnote 10:Respondent's Exhibit D

Footnote 11:Tr 4/9/25 at 45, lines 22-23

Footnote 12:Tr 4/9/25 at 53, line 3

Footnote 13:Tr 12/1/25 at 18, lines 3-5

Footnote 14:Id., line 6

Footnote 15:Id. at 19, lines 18-19

Footnote 16:Id. at 18, lines 13-15

Footnote 17:Id. at 20, lines 6-8

Footnote 18:Tr 4/9/25 at 36

Footnote 19:Id. at 23, lines 15-17